NOT DESIGNATED FOR PUBLICATION

No. 115,078

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

IN THE MATTER OF THE MARRIAGE OF
KAREN S. RODROCK,
*Appellee*,

and

DAROL E. RODROCK,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; DAVID W. HAUBER, judge. Opinion filed June 9, 2017. Affirmed.

*T. Bradley Manson* and *Katie McClaflin*, of Manson Karbank, of Overland Park, for appellant.

*Stephen J. Blaylock* and *David J. Morgan*, of Law Office of Stephen J. Blaylock, Chtd., of Wichita, and *Elizabeth Hill*, of The Hill Law Firm, P.C., of Overland Park, for appellee.

Before ARNOLD-BURGER, C.J., GREEN and MCANANY, JJ.

*Per Curiam*: Darol Rodrock appeals from the district court's divorce decree which severed his marriage to Karen Rodrock, his wife of 49 years, and divided the parties' substantial personal and business assets. Finding no error, we affirm.

1

In March 2014, Karen Rodrock filed for divorce from her husband of 49 years, Darol Rodrock, alleging incompatibility. At the time of trial, Karen was 69 and Darol was 71. During their marriage, Darol worked as a real estate developer while Karen primarily stayed home taking care of the house and children. Darol's real estate development business was extremely successful so that by the time of the divorce the Rodocks had acquired substantial personal wealth and Darol's business owned numerous properties worth millions of dollars. Because Darol's business involved large expenditures of money upfront to purchase and develop land, the parties also had substantial debt.

Much of the 2 1/2-day divorce trial was spent trying to establish the value of Darol's business, Rodrock Development. The other issue raised during the trial that presented an accounting issue was Darol's spending during the divorce. Karen presented evidence that Darol spent over $1 million gambling and sought compensation for Darol's dissipation of the marital estate.

After the trial but before the divorce decree was entered, Karen continued to be concerned about Darol's spending. At that time, Karen had no access to marital assets other than her home, except in the form of monthly maintenance payments. Darol, meanwhile, controlled all other income, assets, and credit. In light of Karen's concerns, the district court appointed a special master to look into how money from the marital estate was being spent. The district court also appointed special masters to oversee the disposition of assets, as needed, to equalize and divide the marital estate.

Nearly 9 months after trial, the district court entered a decree of divorce. In it, the district court divided the Rodrocks' assets, awarding Karen $14,737,352 in investment accounts, several items of personal property, her home, and an additional $538,376 to

offset Darol's dissipation of the marital estate through gambling, for a total award valued at $15,932,668. In addition, because there was a $10 million lien against the investment accounts, the district court awarded Karen maintenance of $40,000 a month until such a time as the lien was paid. Darol was awarded his business, which the district court valued at $15,768,000, and various items of personal property for a total award valued at $16,654,244. The district court ordered the remainder of the parties' real property be sold by the special masters and for the money from the sales to be applied to pay down the lien on the investment account awarded to Karen. In the event that the sale of personal real property raised an insufficient amount of money to pay off the lien, the district court ordered Darol to sell business assets and apply the proceeds to eliminating the lien.

Darol now appeals the district court's order.

ANALYSIS

*We have jurisdiction to consider this appeal.*

While this case was pending on appeal, this court issued a show cause order asking the parties to consider whether the district court's divorce decree was a final order so that it had jurisdiction to hear the case. The parties each filed briefs responding to the court's concerns—Darol arguing that this court had jurisdiction and Karen contending that it did not. This court made note of the parties' responses, issued an order retaining the appeal "on [the] present showing," and asked the parties to further brief the issue in preparation for oral arguments.

In its show cause order, this court expressed concern with language in the divorce decree wherein the district court noted its intention to maintain continuing jurisdiction to oversee and enforce its orders related to the sale and distribution of marital assets. In the months since the show cause order was issued, the district court's orders have been fully

3

complied with—all property that the court ordered sold has been, the lien on the trust account awarded to Karen has been removed, attorney fees have been paid, maintenance payments have ceased, and all chattels awarded Karen are now in her possession. Any need for continuing oversight by the district court has ceased. Karen now agrees that Darol's appeal is properly before this court. So do we. Accordingly, no further examination of this issue is necessary.

*The Kansas Commission on Judicial Qualifications is the body that investigates and resolves general claims of judicial misconduct.*

Darol next argues that the district court violated the Kansas Code of Judicial Conduct at several points during and after the trial. He specifically claims District Court Judge David Hauber violated Kansas Code of Judicial Conduct, Supreme Court Rule 601B, Canon 2 (2017 Kan. S. Ct. R. 433) ("A judge shall perform the duties of judicial office impartially, competently and diligently."). He parses this further by claiming a violation of Rule 2.2 of this Canon (2017 Kan. S. Ct. R. 433) ("A judge shall uphold and apply the *law*, and shall perform all duties of judicial office fairly and *impartially*.") and Rule 2.6(B) of this Canon (2017 Kan. S. Ct. R. 436) ("A judge may encourage parties to a proceeding and their lawyers to settle matters in dispute but shall not act in a manner that coerces any party into settlement."). These claims are based upon his allegation that Judge Hauber used ridicule and sarcasm throughout the proceedings in an effort to get the parties to settle. Moreover, Darol claims that by appointing special masters Judge Hauber was following through on his threats that he would sell off martial assets to liquidate the estate if the parties didn't settle. Darol claims there was no legal authority for him to do so.

While Darol spends a significant amount of time discussing Judge Hauber's alleged errors, Darol fails to demonstrate how he was prejudiced by them or to suggest any remedy this court could provide. This is not, generally, the appropriate forum for

4

raising such complaints. While the appellate courts have heard and decided cases involving judicial misconduct, in those, misconduct is not the basis for a claim itself but rather is tied to some other error. See *State v. Kirkpatrick*, 286 Kan. 329, 347-48, 184 P.3d 247 (2008) (alleging that the defendant was denied his right to a fair trial by judicial misconduct), *overruled on other grounds by State v. Sampson*, 297 Kan. 288, 301 P.3d 276 (2013); *In re Marriage of Roby and Woodley*, No. 108,314, 2013 WL 1458014, at *7-8 (Kan. App. 2013) (unpublished opinion) (alleging that the district court judge committed misconduct by refusing to sign a child support order).

Here, Darol concludes his first argument—that the district court judge used sarcasm to try to coerce the parties into settling—by stating: "The comments and decorum demonstrated by the Court show a bias and prejudice towards Respondent and a disregard for the Kansas Code of Judicial Ethics [*sic*] requiring a judge to perform the duties of judicial office impartially." Similarly, he ends his second argument—that the district court judge attempted to coerce the parties into a settlement by appointing a special master—by noting: "Through improper statements made throughout the proceedings and the erroneous appointment of Special Masters, the Court violated Rule 601B when it attempted to coerce the parties into settlement." Neither of these alleged instances of misconduct involves an issue that can be resolved on appeal because neither is linked to a procedural or evidentiary error. Rather, Darol alleges general malfeasance without consequence.

If, during the pendency of the proceedings below, Darol came to believe his right to a fair trial was in jeopardy because Judge Hauber was biased against him or was otherwise acting improperly, he could have filed a motion for a change of judge. See K.S.A. 20-311d(a). Had that been denied, the denial could have been raised on appeal. Having failed to file such a motion, the appropriate course of action at this stage is not to raise general allegations of misconduct in an appeal but to file a complaint with the Kansas Commission on Judicial Qualifications. Supreme Court Rule 609 (2017 Kan. S.

Ct. R. 472). It is that body that investigates and resolves general claims of judicial misconduct. Moreover, we remind counsel of their own ethical obligations under the Kansas Rules of Professional Conduct (KRPC). KRPC 8.3(b) imposes a duty on lawyers to report ethical violations by judges that raise "a substantial question as to the judge's fitness for office." (2017 Kan. S. Ct. R. 378.) The fact that Darol pursued neither of these remedies certainly bears on the weight we should give to the merits of this contention.

To the extent that Darol's second complaint alludes to an actual procedural error—the appointment of special masters after the conclusion of the trial—that claim would generally be reviewable. But Darol does not make a separate claim that he was prejudiced by the appointment of a special master. He couches it only in terms that the appointment, after unethical threats to do so, further resulted in a violation of Judge Hauber's ethical duties. "An error which does not prejudice the substantial rights of a party affords no basis for reversal of a judgment and may be disregarded." *Drake v. Kansas Dept. of Revenue*, 272 Kan. 231, Syl. ¶ 3, 32 P.3d 705 (2001); see also K.S.A. 60-2105. Darol makes absolutely no claim of prejudice and does not appear to request reversal on that basis.

We do pause to note that Judge Hauber called the people he appointed to assist him in preserving the assets as both special masters and receivers at different times during the proceeding so it is unclear upon which statute he relied, K.S.A. 2016 Supp. 60-253 (special master) or K.S.A. 60-1301 (receiver). But the role he assigned to the persons appointed is more consistent with the role of a receiver to "keep, preserve, and manage all property and protect any business or business interest entrusted to the receiver pending the determination of any proceeding in which such property or interest may be affected by the final judgment." K.S.A. 60-1301. Receivers have the power to "perform such acts respecting the property or business as the judge may authorize." K.S.A. 60-1303. Additionally, the requirements for appointment of a receiver found in K.S.A. 60-1304 were met—the approximate value of the estate was known, Darol was put on notice that

6

Karen was seeking the appointment of someone to guard the estate, and a hearing was held prior to the appointment.

It is not uncommon for a receiver to be appointed to assist with the disposition of marital property in situations where there is a concern that one of the parties will commit "'fraud or [there is] imminent danger of the property sought to be reached being lost, injured, diminished in value, destroyed, wasted, or removed from the jurisdiction.'" *In re Marriage of Briggs*, No. 106,990, 2013 WL 195519, at *4 (Kan. App. 2013) (unpublished opinion). That was clearly the case in the Rodrock divorce.

Before trial, Karen filed a motion asking the district court to appoint a receiver to oversee the parties' financial transactions because she was concerned about the way Darol was spending money and the fact that he had complete control over the marital estate. After a hearing, the district court denied the motion finding that Karen failed to present sufficient evidence that a receiver was needed. After trial, Karen filed a second motion asking that a special master be appointed to oversee the financial transactions the district court ordered the parties to engage in at the close of trial to ensure that each party receive a nearly equal portion of the marital estate. At that time, the district court agreed that oversight was necessary and appointed a professional to oversee the personal finances of the parties and two professionals to oversee business related income and expenditures as well as the sale of the parties' real property.

Judge Hauber frequently substituted the terms special master and receiver in his decree of divorce. He discussed the appointment of the special masters but then made note that it was within his power to "appoint a receiver or other agent in order to facilitate the sale of marital property." And that "[w]here the relationship between the parties is particularly acrimonious, the appointment of a receiver to sell marital real estate may be particularly provident." The court followed those statements of law by noting that it had chosen to appoint special masters to carry out those tasks. The district court did not

7

address why it opted to call its appointees special masters rather than receivers either at the hearing or in the decree.

So not only is there no showing that his actions were unethical, it was not error for the district court to appoint receivers to assist with the sale of marital property and financial oversight while the district court's orders were being carried out. See *In re Marriage of Briggs*, 2013 WL 195519, at *4. Moreover, Darol does not claim he was harmed by the district court's actions.

*Darol failed to properly preserve the issue of division of debt for appellate review.*

Darol next argues that the district court erred when it failed to divide $2.8 million of marital debt between the parties. Darol contends that despite agreement between the parties about the existence of the marital debt, the district court failed to account for it in its divorce decree dividing the parties' assets. Before reaching the merits, it is necessary to determine whether Darol preserved this issue for appellate review so that this court can consider the claim.

Supreme Court Rule 165 (2017 Kan. S. Ct. R. 214) places on the district court the primary duty to provide adequate findings and conclusions in the record of the court's decision on contested matters. A party, however, must object to inadequate findings of fact and conclusions of law to preserve complaints regarding the adequacy of findings and conclusions for appeal. *Fischer v. State*, 296 Kan. 808, 825, 295 P.3d 560 (2013).

In *In re Marriage of Bradley*, 258 Kan. 39, 899 P.2d 471 (1995), our Supreme Court was asked to clarify when a party's failure to object to the district court's findings of fact and conclusions of law in accordance with K.S.A. 60-252 becomes a barrier to appellate review. The court held:

"In all actions under K.S.A. 60-252 and Rule 165, when the trial court has made findings, it is not necessary to object to such findings to question the sufficiency of the evidence on appeal. However, if the findings are objectionable on grounds other than sufficiency of the evidence, an objection at the trial court level is required to preserve the issue for appeal. If, however, the appellate court is precluded from extending meaningful appellate review, the case may be remanded although no objection was made in the trial court." 258 Kan. at 50.

The court explained that the purpose of the rule is to force parties to bring "alleged deficienc[ies] to the attention of the district court, which can then amend, clarify, or change its decision if necessary, *before* the parties go to the expense and delay of an appeal." 258 Kan. at 49.

Here, Darol's complaint is about something more than the sufficiency of the evidence; it is, instead, that the district court failed to consider and account for a piece of property when dividing marital assets. It does not appear from the record that Darol raised the issue of the district court's failure to divide the debt between the parties below by filing a motion to alter or amend the divorce decree so that the division of the marital estate included a division of marital debt. By not raising it below, Darol failed to properly preserve this issue for appeal. See *Green v. Geer*, 239 Kan. 305, 311, 720 P.2d 656 (1986) ("In the absence of an objection, omissions in findings will not be considered on appeal.").

*The district court did not err when it awarded Karen attorney fees.*

Darol next complains that the district court erred when it awarded Karen attorney fees. K.S.A. 2016 Supp. 23-2715 vests district courts with the authority to award attorney fees in divorce cases to either party "as justice and equity require." When a district court exercises its authority and awards attorney fees, the decision is reviewed for an abuse of discretion. *In re Marriage of Patterson*, 22 Kan. App. 2d 522, 534-35, 920 P.2d 450

(1996). A district court abuses its discretion when it acts (1) arbitrarily, fancifully, or unreasonably so that no person would have taken the view of the district court; (2) based on an error of law; or, (3) based on an error of fact. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013).

Although Darol complains that the district court awarded Karen attorney fees, in actuality what the district court did was "to equalize from the marital estate all sums expended so that each party will be entitled to an equal litigation expense sum, but no more." To that end, the district court ordered: "[B]oth sides will be awarded their costs up to and including the date of issuance of this Decree that does not exceed the amount spent by either side. In other words, if respondent spent or incurred $250,000 then petitioner shall be entitled to the same." Such expenses were to "be paid forthwith from the marital estate."

Darol's contention that the order required him to pay Karen's attorney fees is both partially true and misleading. The district court found that Darol had nearly complete control over the marital estate prior to its division. As a result, any payments made out of the marital estate were necessarily made by Darol. However, the order did not require Darol, as he tries to imply, to pay attorney fees out of the portion of the marital estate awarded to him; instead, they were to be paid from the marital estate prior to its division.

The district court did not abuse its discretion when it ordered the attorney fees incurred by both parties up to the date of the divorce decree to be paid out of the marital estate. See *Baumgardner v. Baumgardner*, 207 Kan. 66, 70, 483 P.2d 1084 (1971) (upholding the district court's order granting each party an equal amount of money for attorney fees to be paid out of the parties' joint bank account). It was reasonable for the district court to ensure that both parties benefited equally from the depletion of the marital estate to cover their attorney fees, the district court had the statutory authority to

10

make such an award, and the decision was based on a firm understanding of the facts. The district court's award of attorney fees should be affirmed.

*The district court's award to Darol was not illusory.*

Darol next makes something of a cumulative error argument, contending that the district court's various miscalculations and award errors resulted in his award being illusory. District courts have broad discretion to determine the property rights of parties to a divorce action. *In re Marriage of Wherrell*, 274 Kan. 984, 986, 58 P.3d 734 (2002). This court will not disturb a district court's award of marital property "absent a clear showing of abuse." 274 Kan. at 986. Discretion is abused when the district court acts (1) arbitrarily, fancifully, or unreasonably so that no reasonable person would have taken the view of the district court; (2) based on an error of law; or, (3) based on an error of fact. *Northern Natural Gas Co.*, 296 Kan. at 935.

As with the issue of the district court's failure to divide and allocate the marital debt between the parties, there is a question regarding whether this issue is properly preserved for appeal. Darol did not object to the district court's award by filing a motion to reconsider or alter or amend the judgment so that the district court could review the award and make any necessary adjustments. See *In re Marriage of Bradley*, 258 Kan. at 50 (clarifying that an objection is necessary for appellate review unless the issue is sufficiency of the evidence). Darol's claim that his award is illusory alleges something more than that the evidence simply did not support the district court's factual findings; instead, he contends that the district court failed to properly consider various factors and the ultimate impact of the order. But even if we consider the issue properly preserved, Darol's arguments are not persuasive.

11

Our analysis begins with a look at K.S.A. 2016 Supp. 23-2802 which governs the division of marital property in the event of a divorce. When dividing property, district courts are to consider a number of factors:

> "(1) The age of the parties; (2) the duration of the marriage; (3) the property owned by the parties; (4) their present and future earning capacities; (5) the time, source and manner of acquisition of property; (6) family ties and obligations; (7) the allowance of maintenance or lack thereof; (8) dissipation of assets; (9) the tax consequences of the property division upon the respective economic circumstances of the parties; and (10) such other factors as the court considers necessary to make a just and reasonable division of property." K.S.A. 2016 Supp. 23-2802(c).

It is important to recognize that after considering all of these factors, the division of property need not be equal, it must merely be "just and reasonable." *LaRue v. LaRue*, 216 Kan. 242, 250, 531 P.2d 84 (1975).

Darol contends that the division was not just and reasonable because: he would be forced to pay off the lien on the trust account awarded to Karen and to pay the special masters' fees using assets he was awarded; he would be forced to sell business assets; and $2.8 million of debt that was solely in his name was awarded to him by default thereby reducing the value of his award.

Despite Darol's misgivings, the district court clearly took many of the K.S.A. 2016 Supp. 23-2802 factors into consideration when it arrived at its ultimate award, including the parties' ages, the property they owned, their present and future earning capacities, dissipation of assets, and Darol's need for liquidity to keep his business running. In light of these considerations, the district court awarded assets to Darol with present values estimated to be $16,654,244 including sole ownership of all of his business assets. Meanwhile, the district court awarded Karen assets, including all trust assets, valued at $15,932,668.19 plus maintenance of $40,000 a month until the lien on the trust account

12

that was used to secure loans taken out by Darol's business was paid. Recognizing Darol's need for liquidity to keep his business running, the district court granted Darol the right to the $575,000 a year in interest that the trust generated during the period that he was working towards paying off the lien. Once the $10 million lien was paid, the trust income was to go to Karen.

Darol's accountant, Sarah Stubler, testified that in 2013, Darol's income was $1.8 million and that he made $1.5 million in the first 6 months of 2014. Karen had not worked in decades and was unlikely to obtain employment, at the age of 69, after the divorce. Her total yearly income, once maintenance payments ceased, was limited to the interest on her trust account. Thus, when it awarded Darol his business and all of its assets, the district court put Darol in a position to earn multiple times what Karen would each year going forward.

Although Darol complains that the district court's order that he pay off the Intrust Bank lien on the trust account awarded to Karen and pay the fees associated with the special masters will reduce his award and result in the forced sale of his business assets, this is not a foregone conclusion. The district court ordered that all real property owned by both Darol and Karen be sold and the proceeds be used to pay down the balance on the lien and pay all costs associated with the special masters. The collective appraised value of the parties' real property, after deducting the $592,000 lien on the Gardner property, was $9,643,000. It seems that the court anticipated that the sale of the property would be insufficient to completely pay off the lien and compensate the special masters and addressed the insufficiency in several ways.

First, the district court awarded Darol assets it valued at $721,576 more than those it awarded Karen. Second, the court recognized that the sale of the marital property, in addition to adding liquidity to the estate, would free up a substantial amount of money that had previously been spent maintaining the properties. With the sale of the properties,

13

the district court anticipated that Darol would be able to repurpose money he had been spending on upkeep and focus on paying down the lien. It was only if these things alone were insufficient to enable Darol to quickly pay off the loan that the special masters were to oversee the sale of some of Darol's business assets.

Because Darol's business is to buy, develop, and resell land, sales are a normal part of Darol's business that, presumably, would be occurring with or without a court order to sell assets. The court order did not force Darol to immediately liquidate property or to sell anything in a way that might jeopardize Rodrock Development. The only difference the divorce decree made was to shift profits away from Darol and put them towards paying down the lien until such time as it was fully paid.

Specifically with regard to the fees associated with the work of the special masters, it was not an abuse of discretion for the district court to order Darol to pay them in the event the sale of the marital property did not generate enough income to cover them for an additional reason:  It was Darol's actions that prompted the district court to appoint special masters. The district court ordered them to oversee the disposition of assets and the payoff of the lien because it did not trust Darol to do this on his own given his failure to pay the lien down in the past and history of dissipating marital assets. Since Darol's actions prompted the district court to appoint special masters, it is a reasonable consequence that Darol bear the burden of compensating them.

Finally, the district court's de facto award of the $2.8 million in debt to Darol does not make his award illusory. As already discussed, Darol's award was larger and his future earning potential greater than Karen's potential earnings. After the divorce and the resulting reduction of his assets, Darol had the ability to generate income for himself while Karen, 69 years old with several medical problems and no work history, did not. Thus Darol had a greater ability to pay the debt without the payments impacting his award or lifestyle. Divisions do not have to be equal to be upheld, they must simply be

14

just and equitable. There is no indication that Darol did not receive a just and equitable portion of the marital estate he worked so hard to build.

*The district court did not err when it found that Darol dissipated the marital estate.*

In Darol's final argument, he once again raises an issue that should have been brought to the attention of the district court rather than raised for the first time on appeal. Darol argues that the district court erred when it concluded that he had dissipated the marital estate by gambling. Unlike several of his other complaints, Darol frames this as a sufficiency of the evidence argument, contending that "[t]here was not substantial competent evidence to show that the finances of the martial estate were disturbed or dissipated by [his] gambling."

In its divorce decree, the district court made extensive factual findings regarding Darol's gambling habit. Of special note, the district court found:

> "A paralegal for petitioner's counsel, Patty Gehrke, testified as to her creation of a demonstrative exhibit, Pet. Ex. 6, which outlined ATM charges, credit card documents, etc., and concluded from August 2013 to through June 2014 gambling expenses were $681,134.48 and then from July 2014 to November 2014 there were gambling expenses of $301,155.17. Tr. II, at p. 146, 1. 20 – p. 150, 1. 11. In the three months leading up to trial, gambling charges were $83,242.56. P. 150, 1. 17-20. The evidence shows that from August 2013 to February 2015, Mr. Rodrock gambled with $1,076,752."

The district court also referenced the special master's report, as evidence of Darol's dissipation:

> "There are an astounding number of ATM Cash Advances and large checks to others for unidentified purposes, totaling, from July 2014 to June 2015 $1,076,752. Exhibit of Monthly Breakdown of Cash Advances and Checks to Others, Special Master's

report dated December 8, 2015. This is consistent with the evidence of large gambling expenses incurred by respondent. Little or no excuse was given for these expenditures or activities, other than Mr. Rodrock is a gambler in business and in pleasure."

While there was extensive testimony regarding the amount of money Darol spent gambling during the divorce proceedings, there is not testimony regarding whether the gambling impacted the estate. The evidence does support a finding that most of Darol's gambling was done using borrowed money. But we are unable to find any corresponding evidence in the record to show whether: (1) the credit card balances were routinely paid off using marital funds; if not, (2) Darol was the sole owner of the credit accounts so that he would automatically be liable for the debt after the dissolution of the marriage when the district court failed to specifically award/divide the debt; or, (3) if the credit cards were paid on/off during the pendency of the divorce, whether the payments were made using draws on other lines of credit owned solely by Darol and, by default, awarded to him in the divorce decree.

While Darol presents this court with an interesting hypothesis that could lead to a finding that the district court erred, he does little to support his hypothesis by reference to the record. Generally, the burden is on the party making a claim to ensure that the record on appeal includes all evidence necessary to support the claim and to point this court to the places in the record where that evidence can be found. *State v. Sasser*, 305 Kan. 1231, 391 P.3d 698, 709 (2017); *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 644, 294 P.3d 287 (2013). Without such a record, the claim of error fails. 296 Kan. at 644. Darol has failed to properly support his argument that marital estate was not impacted by his gambling. Throughout the pretrial and trial process, Darol made no real effort to contradict Karen's evidence regarding the amount he spent gambling. Even on appeal, Darol makes no effort to argue that the finding regarding the amount he spent gambling was incorrect or not supported by the evidence.

16

Based on its finding that Darol gambled away over $1 million, the district court concluded that he had "dissipated significant assets" and awarded Karen "an additional $538,376 to account for respondent's use of discretionary funds" out of the marital estate during the pendency of the divorce. Dissipation by either party is one factor that courts should consider when dividing a marital estate. K.S.A. 2016 Supp. 23-2802(c)(8). Dissipate is defined by "Black's Law Dictionary 473 (6th ed. 1990) . . . as '[t]o destroy or waste, as to expend funds foolishly.' Webster's New Collegiate Dictionary 366 (9th ed. 1991) defines the term as 'a: to expend aimlessly or foolishly b: to use up esp. foolishly or heedlessly.'" *In re Marriage of Rodriguez*, 266 Kan. 347, 352, 969 P.2d 880 (1998). It is hard to imagine that any reasonable person would not view losing over $1 million gambling as a foolish expenditure of funds. The district court was correct to label these expenditures dissipation. Furthermore, the district court was correct to offset Darol's award by half the amount of money he wasted from the marital estate. See 266 Kan. at 353.

Moreover, we pause to note that during Darol's testimony, he recognized that he is a gambler and told the court that "if it comes down as an issue, I'll pay her half of that to gamble. If it's a million dollars, put 500 more on it, whatever you said. I'm fine." To the extent Darol argues that it was error for the district court to award Karen an additional sum equal to half the amount Darol dissipated gambling during the pendency of the divorce, the error was invited. Generally, when a party has invited an error, the error cannot be complained of on appeal. *Thoroughbred Assocs. v. Kansas City Royalty Co.*, 297 Kan. 1193, 1204, 308 P.3d 1238 (2013).

Following oral argument of this case, Karen filed a motion pursuant to Supreme Court Rule 7.07(b) and (c) (2017 Kan. S. Ct. R. 50) for attorney fees incurred in connection with this appeal. After due consideration and review, Karen's motion is granted in part. Darol is assessed attorney fees on appeal in the amount of $30,311.

17

Affirmed. Motion for attorney fees on appeal granted in part.