NOT DESIGNATED FOR PUBLICATION

No. 121,506

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Marriage of

ELIZABETH A. DEPRIEST,
*Appellee*,

and

DONALD F. WEAVER,
*Appellant*.


MEMORANDUM OPINION

Appeal from Johnson District Court; RHONDA K. MASON, judge. Opinion filed April 23, 2021. Affirmed.


*Donald F. Weaver*, appellant pro se.


*Janet L. Damore*, of The Damore Law Firm, LLC, of Leawood, for appellee.


Before BRUNS, P.J., BUSER, J., and WALKER, S.J.


PER CURIAM: Donald F. Weaver appeals from the district court's division of assets in his divorce from Elizabeth A. DePriest. His pro se brief is difficult to read and fails to comply with the Kansas Supreme Court rule requirements for appellate briefs. See Rule 6.02(a) (2021 Kan. S. Ct. R. 35). The quality of his brief makes it difficult to ascertain the rulings that Weaver is appealing. However, there are three common themes in his brief. Weaver alleges: (1) DePriest submitted a fraudulent Domestic Relations Affidavit (DRA), (2) the district court erred by allowing DePriest to admit exhibits summarizing financial documents, and (3) the district court erred in finding that Weaver

1

dissipated marital assets. Because we find Weaver's arguments to be unpersuasive and not supported by the record, we affirm the district court's decision.

FACTS

This divorce proceeding returns for the second time to our court. The case began in October 2016 when DePriest filed a petition for divorce from Weaver. Weaver's tardiness in filing an answer and responding to court orders resulted in the district court granting DePriest a default judgment. Weaver appealed. A panel of our court reversed and remanded the case on the basis that the district court had not exhausted other remedies for noncompliance with its orders and therefore default judgment was too severe a sanction. *In re Marriage of DePriest and Weaver*, No. 117,682, 2018 WL 3485722 (Kan. App. 2018) (unpublished opinion).

The parties returned to the district court for a status conference in September 2018. The court delineated the scope of discovery, scheduled various deadlines, and set the matter for trial.

A one-day bench trial was held in December 2018. In order to fully understand and evaluate the district court's decision dividing property in this case, it will be necessary to discuss the evidence presented in some considerable detail.

According to DePriest and a marriage certificate in her possession, the couple was married in June 2008. However, Weaver believed that they were married in 2009 and refused to stipulate to the validity of the certificate. DePriest was 51 years old at the time of marriage and Weaver was 42, which made them 62 and 53 years old respectively at the time of trial. Weaver described himself as "an investment banker by trade." DePriest was a certified registered nurse anesthetist and had plans to retire at age 65.

At the time of trial, DePriest had two adult sons in their early 20s from a prior relationship. She maintained responsibility for caring for one of her sons who, at that time, was in a mental health facility. Upon release, her son planned to live with DePriest. Her other son was in college but would stay with DePriest during school breaks and received financial support from DePriest.

Weaver entered the marriage with student loan debt and no assets. DePriest brought substantial assets into the marriage. Her primary assets were a house in Roeland Park, Kansas, a house at Lake Lotawana, a pontoon boat and motor, a Bluegreen Vacation Club timeshare, and three retirement plans. Her retirement accounts included Insight Financial (previously called Pershing and referred to as such occasionally at trial) ($371,665), John Hancock 401(k) ($33,140), and a smaller account with Anesthesiology Professionals ($4,742). Totaling the values of these assets, DePriest estimated her premarital assets to be $562,588.

*The house at Pagosa Springs*

DePriest testified that shortly after their marriage the stock market was in decline. She and Weaver began discussing the idea of using DePriest's retirement funds to build a house in Pagosa Springs, Colorado. Weaver suggested that DePriest take money out of her retirement accounts and invest it into a self-directed IRA in real estate. Weaver told DePriest that he could construct the house himself for approximately $250,000 and that it would be ready in about six months. DePriest agreed but planned to have little involvement in the project, trusting Weaver to do what he said he could do and relying on his expertise. DePriest opened a self-directed IRA account with IRA Services Trust Company on July 30, 2009. Her initial contribution to the account of $238,178.55 came from her premarital funds at Pershing.

Since DePriest could not directly spend funds from the self-directed IRA on the Pagosa Springs residence, she established Blue Moon, LLC to facilitate the project. Blue Moon opened an account at Bank of America. Both Weaver and DePriest had signatory authority on Blue Moon's account. DePriest would transfer money from the self-directed IRA to Blue Moon and the Blue Moon funds could then be used to construct the Pagosa Springs property. The money in the Blue Moon account was to be used solely for the Pagosa Springs project. It was not to be used for personal expenses.

On August 5, 2009, DePriest made her first transfer from the self-directed IRA to Blue Moon in the amount of $235,523.31. A couple of weeks later, DePriest deposited the remainder of her Pershing account, about $418, to the self-directed IRA. There was no explanation offered at trial as to why DePriest's Pershing account was worth $371,665 at the time of marriage but less than $240,000 when she transferred the funds in the account to her self-directed IRA.

Seventeen months later, in December 2010, only $2,565 was left in the Blue Moon account. Although it had been more than a year and DePriest had expended almost $250,000, the house was still just a shell—a structure with nothing inside. Additionally, Weaver did not have insurance to protect the property and he was not bonded, leaving DePriest's investment at risk. Once DePriest realized there was no insurance and attempted to obtain some, she learned she could not insure the property until she had a certificate of occupancy.

Very little construction occurred in 2011 and 2012. DePriest deposited an additional $4,742.25 in the self-directed IRA which she received from a premarital former employer. This money was mostly used for utilities and bank fees.

In April 2013, DePriest deposited another $141,463.69 into the self-directed IRA. The money was rolled over from her John Hancock IRA which DePriest recently had

been able to access because she stopped working for the employer that sponsored the account. She then moved $100,000 of this into the Blue Moon account. At this point, she had cumulatively invested at least $350,000 into the project.

Around this time, the Pagosa Lakes Property Owners Association (POA) sued Blue Moon for violating various building codes and the POA's rules and regulations. The POA also obtained a temporary restraining order preventing Weaver from working on the house. DePriest believed the lawsuit occurred because Weaver mismanaged the construction. By the end of 2013 DePriest still could not get a certificate of occupancy to insure the house and only $18,065.93 remained in Blue Moon's account.

Weaver had the Pagosa Springs house appraised in January 2014. During the appraisal, Weaver estimated the cost to finish the house was $60,000. A couple of weeks after the appraisal DePriest transferred another $40,000 into the Blue Moon account. Coupled with the $18,000 already in the Blue Moon account, DePriest believed Weaver would be able to complete the home without any additional funds. By May 27, 2014, however, the account had a negative balance of $81.25 and the house was not complete.

DePriest opened another retirement account, an SEP IRA with Vanguard, during the marriage. She made two $10,000 deposits to the Vanguard IRA in 2013 and 2014. On May 28, 2014, DePriest transferred the $20,000 in her Vanguard IRA to her self-directed IRA, and then into the Blue Moon account. When this money was nearly depleted, she transferred another $8,000 in July 2014. She continued this pattern of replacing depleted funds with transfers from her Vanguard account of $8,000 in July 2014, $14,000 in November 2014, and $10,000 each in December 2014, March 2015, and June 2015. By June 2015, DePriest had moved a total of $72,000 from her Vanguard IRA to Blue Moon.

DePriest made a surprise visit to Colorado in June 2015 to figure out why the project was taking so long to complete and to determine whether Weaver was really

5

working. DePriest found Weaver living with another woman. DePriest felt like Weaver was taking advantage of her by depleting her funds while being with another woman.

Despite this revelation, DePriest continued making deposits into the self-directed IRA that were then transferred to Blue Moon. DePriest made two direct contributions of $5,000 into the self-directed IRA in August 2015, almost all of which she subsequently moved to the Blue Moon account. She removed Weaver from the Blue Moon account in October 2015. There was less than $600 in the account when DePriest removed Weaver. DePriest still could not get a certificate of occupancy for the house. Under the circumstances, DePriest began searching for someone who could finish the job.

DePriest worked with contractors to complete the house. An electrician had to redo some work that had not been done properly. By March 2016, DePriest was able to get a certificate of occupancy and insurance for the house. Between initial construction in 2009 through March 2016 her entire investment had been at risk. DePriest secured renters for the Pagosa Springs residence and had earned just over $6,000 in rental income by the time she filed for divorce.

At the time she filed for divorce, DePriest valued the Pagosa Springs house at $366,600. While the county had only assessed the property at $328,770 in 2016, DePriest had the home valued by a realtor in February 2017 who provided a value of $366,635. DePriest used the realtor's valuation in her proposed division of assets.

In total, between opening the account in July 2009 and filing for divorce in October 2016, DePriest made $486,724.16 in contributions to the self-directed IRA. Of those funds, $482,276.95 were transferred to the Blue Moon account.

At trial, DePriest claimed that Weaver used a significant amount of money from Blue Moon's account for his personal consumption. To document her contention,

DePriest presented an exhibit at trial summarizing the funds she believed were for Weaver personally rather than the Pagosa Springs house. These included direct charges to Blue Moon's account, transfers to bank accounts Weaver established under trade names, and the costs of the POA lawsuit. In total, she believed $130,127.59 of her funds had been dissipated by Weaver for his own personal expenses.

Included in DePriest's total was $71,600 that Weaver paid to The Complete Carpenter. The Complete Carpenter was a trade name used by Weaver, and Weaver ostensibly established a bank account for The Complete Carpenter to enable him to build the home while staying within IRS rules on self-directed IRAs. Weaver said he was a 49% minority owner in the company. The bank statements for The Complete Carpenter were introduced at trial. An overwhelming number of charges were clearly for personal purchases at places like liquor stores, grocery stores, bars, restaurants, gas stations as well as for cash withdrawals, and even a charge for Ride the Ducks in Branson, Missouri. Occasionally there were charges at hardware or lumber stores. However, Weaver did not provide any receipts for his purchases, contracts, purchase orders, invoices, or other documents that would show that the money went towards building the Pagosa Springs residence.

Weaver had a similar account under the trade name Trim Works. DePriest identified over $16,000 in funds that were moved from the Blue Moon account to Trim Works. The purchases made from Trim Works' account were very similar to those made from The Complete Carpenter's account.

DePriest also identified numerous charges made directly to Blue Moon's account that she believed were for Weaver's personal benefit. Like the charges to the Trim Works and The Complete Carpenter accounts, many of the direct charges to the Blue Moon account were for convenience stores, fast food, gas stations, and groceries. Weaver also

7

made cash withdrawals. Additionally, Weaver wrote several checks to another individual that were then endorsed back to Weaver.

DePriest included the cost of the POA lawsuit in her summary because she believed those charges should be borne by Weaver due to his mismanagement of the construction project.

*The Crested Butte property*

The Pagosa Springs residence was not the only topic discussed at trial. DePriest sold the Lake Lotawana property she brought into the marriage in 2011. After expenses, she earned $159,960 from the sale. DePriest had to pay capital gains tax on the proceeds. She used the proceeds from the sale to purchase a home in Crested Butte, Colorado. The Crested Butte home cost $150,000. DePriest used $98,448.15 of the Lake Lotawana proceeds on the Crested Butte home, and took out a loan for the balance. DePriest sold the Crested Butte residence in July 2016, shortly before filing for divorce. She later sold the property for $325,000 and, after paying off the mortgages on the property, was left with $240,881.31.

*The Highlands Ranch property*

DePriest used $236,381 of the proceeds from Crested Butte to purchase a property in Highlands Ranch. She purchased the property in September 2016. The purchase price was $310,000, and DePriest covered the balance with a loan. DePriest received less than one month's rent from the Highlands Ranch property, prorated to $1,096.77, before she filed for divorce.

*DePriest's requested division of property*

DePriest asked the district court to restore the entry value of her assets. She also asked for a majority of the real estate, including the houses in Roeland Park, Highlands Ranch, and Pagosa Springs. She offered to assume all marital debts. DePriest asked that each party retain their personal vehicle. She also requested that the court award Weaver his individual retirement account valued at $1,614, a lot of land they had purchased around the time of their marriage valued at $1,000, and a pontoon boat and motor valued at $4,390.

*The district court's decision*

In May 2019 the district court issued its final journal entry on the division of property. It found the entry value of DePriest's property was $562,588. Much of the marital property could be traced back to DePriest's premarital assets. Weaver had no premarital assets. The court held that DePriest presented tangible evidence tracing her individual assets to the existing marital assets.

After reviewing the bank records, the district court believed there was "clear evidence" that Weaver took money out of Blue Moon's account and "us[ed] it for his own personal benefit, either by making cash withdrawals, using the check card, or writing checks payable to himself or third parties so he would have funds available for his personal use at gas stations, convenience stores, car washes, fast food restaurants, liquor stores, grocery stores, bars, and auto centers to name a few." And, despite knowing that it was critical to maintain records regarding the construction of the Pagosa Springs residence, Weaver "failed to provide any contracts, agreements, subcontracts, purchase orders, invoices, or other documents requested by Ms. DePriest during the course of discovery that would support the costs incurred in constructing the residence." In essence, the court observed, "[h]e was spending money without any regard for Ms. DePriest's

9

interest, and generally living an independent life while funding his individual needs." The court, adopting the estimate submitted by DePriest, held that Weaver dissipated $130,128 in marital assets.

The district court accepted DePriest's proposed division of property and debt. After balancing the assets and debts awarded to each party and considering the dissipation, the court found that Weaver owed DePriest an equalization payment of $116,221.

Weaver has timely appealed from the district court's orders. After appealing, Weaver made several motions including a motion to void judgment, motion for mistrial, and motion for relief under K.S.A. 2020 Supp. 60-260(b). The district court denied each of these motions, holding that it did not have jurisdiction to modify the judgment after the appeal had been docketed.

ANALYSIS

*Weaver's failure to follow Kansas Supreme Court Rules*

Weaver filed a pro se brief with this court which is, at times, very difficult to decipher. In response to Weaver's brief, DePriest has asked us to affirm the district court's judgment on the basis that Weaver failed to comply with Kansas Supreme Court Rule 6.02(a), which specifies the requirements for appellate briefs. This rule provides:

"(a) **Required Contents.** An appellant's brief must contain the following:
    (1)   A table of contents that includes:
        (A) page references to each division and subdivision in the brief, including each issue presented; and
        (B) the authorities relied on in support of each issue.

10

(2)   A brief statement of the nature of the case—e.g., whether it is a personal injury suit, injunction, quiet title, etc.—and a brief statement of the nature of the judgment or order from which the appeal was taken.

(3)   A brief statement, without elaboration, of the issues to be decided in the appeal.

(4)   A concise but complete statement, without argument, of the facts that are material to determining the issues to be decided in the appeal. The facts included in the statement must be keyed to the record on appeal by volume and page number. The court may presume that a factual statement made without a reference to volume and page number has no support in the record on appeal.

(5)   The arguments and authorities relied on, separated by issue if there is more than one. Each issue must begin with citation to the appropriate standard of appellate review and a pinpoint reference to the location in the record on appeal where the issue was raised and ruled on. If the issue was not raised below, there must be an explanation why the issue is properly before the court." Supreme Court Rule 6.02(a) (2021 Kan. S. Ct. R. 35-36.)

We concur with DePriest that Weaver has substantially failed to comply with these rules.

For example, Weaver's brief includes a table of contents, although it is out of order and missing some page references to the divisions within his brief. The brief's nature of the case section does not mention that this is a divorce action, but it does summarize Weaver's primary argument in this case which is that "[t]he final decree is packed full of FALSE statements and other information that was NOT in the trial or part of the record.

The bigger problems with Weaver's brief arise from his issue statements, facts section, and analysis. Weaver's issue statements are as follows:

"**Issue I:** K.S.A. 60-260(b), Petitioner and her attorney committed several frauds on the court, both thru submissions to the court, as well as statements to the court."

11

"**Issue II:** K.S.A. 60-1610, The Court failed to rule on the facts of the case. The evidence shows that the Court not only failed to follow Kansas Family Guidelines, but also maliciously placed $120,000 penalty on the defendant, based on fraud by the petitioner and her attorney, that is on top of the $140,000 in market losses the petitioner is trying to get the defendant to preplace [*sic*]."

"**Issue III: KRPK 3.4** The petitioner's attorney Janet Da[m]ore submitted fraudulent documents to the court, petitioner's exhibits #2, #6, #7. These documents were used in place of real evidence to convince the judge; (1) there were no assets to divide; (2) as well as Dissipation, [*sic*]."

"**Issue IV:** the petitioner made many violations of KRPC 3.3, these statements were; (1) false statements of fact; (2) statements of a material nature; (3) frivolous request for evidence."

While he purports to separate his brief into issues, his arguments are jumbled and poorly framed. It is difficult to ascertain any discrete issues for us to analyze.

Additionally, Weaver's facts section is neither concise nor complete, and it is rife with argument. For example, he states that "[t]he petitioner's attorney Janet Damore made false statements to the court at every hearing." He criticizes Damore's argument to the court, saying: "This is not fact based, this is a sad for [*sic*] of deductive 'logic'." He makes other arguments in the facts section, such as alleging that "Petitioner omitted the $63,000 in rental income from the PETITIONER'S DRA . . . to date the investment has earned over $100,000 in rental income." And, "[t]he petitioner is trying to get the court to make the defendant covers [*sic*] her losses in the stock market. These are losses that happened before the defendant had access to any funds."

Weaver also complains about discovery and accuses DePriest of concealing information from him. For instance, he argues that DePriest had a secret IRA with IRA Services Trust Company that the court mentioned in its final decree. On this point he

12

stated: "The defense is pondering weather [*sic*] this is another EX PARTE communication between the judge and the attorney Janet Damore, or if the judge is JUST MAKING IT UP!" There are numerous examples of inappropriate argument in Weaver's fact section. As DePriest summarizes it: "It is not a 'concise' statement; it is rambling and incoherent."

While Weaver does occasionally cite to the record, there are many assertions with no citation or an incomplete citation. For example, he provides a record cite to support his assertion that DePriest had a secret IRA with IRA Services Trust Company, but the portion of the record to which he cites shows that DePriest was discussing her IRA with Vanguard, not some secret second account with IRA Services Trust Company.

Weaver's statements of the standards of review are also deficient. As stated, it is difficult to ascertain exactly what issues he is raising. He does attempt to include a standard of review at the beginning of each issue section. As an example, he partially frames his first issue around K.S.A. 2020 Supp. 60-260(b)(3), (b)(4), and (b)(6) and accuses DePriest and Damore of committing frauds on the court. However, he provides only the standard of review for K.S.A. 60-260(b)(4) (unlimited review) and does not include the standard of review for K.S.A. 60-260(b)(3) or (b)(6) (abuse of discretion). See *In re Adoption of A.A.T.*, 287 Kan. 590, Syl. ¶ 1, 196 P.3d 1180 (2008). Additionally, this section is not limited to his K.S.A. 2020 Supp. 60-260 motion and brings in separate issues related to admission of evidence, sufficiency of the evidence, and discovery requests.

Similarly, Weaver's third issue purports to address the admission of three exhibits. As his standard of review, he states:

> "Kansas Court of Appeals reviews all appeals de novo, for fairness. The court
> reviews materiality de novo, [*In re Kline*,] 298 Kan. 96, *96, 311 P.3d 321, **321; 2013

Kan. The Supreme Court has continued to apply a 'sufficiency of the evidence' standard of review when a party appeals from an order granting a divorce. See *LaRue v. LaRue*, 216 Kan. 242, 245-46, 531 P.2d 84 (1975); *Berry v. Berry*, 215 Kan. 47, 49, 523 P.2d 342 (1974). *Kan. R. Rel. Disc. Att. 3.4.* Falsifying evidence is also generally a criminal offense. Paragraph (a) applies to evidentiary material generally, including computerized information." (Errors in original.)

Weaver's statement makes little sense and does not even attempt to state the standard of review for admission of evidence. He then goes on to complain that DePriest submitted a fraudulent DRA, notarized by her attorney, and that both of them have committed criminal offenses. He also alleges that Damore engaged in attorney misconduct.

His fourth issue statement alleges that DePriest violated the Kansas Rules of Professional Conduct. First, it should be noted that these rules apply to attorneys, not their clients. Second, as a standard of review he cites to a Nevada case which is not binding on Kansas courts. *State v. Quested*, 302 Kan. 262, 273, 352 P.3d 553 (2015).

Weaver's legal arguments and citations in support are just as deficient as his standards of review. He frequently makes assertions without supporting them with citations. Of critical importance, on multiple occasions he blatantly misrepresents the holding of a case or changes quotations to fit his argument. For example, in setting up his argument that DePriest submitted a fraudulent DRA he cites *In re Estate of Loughmiller*, 229 Kan. 584, 629 P.2d 156 (1981) and quotes: "'Without a true and accurate DRA, the judgement [*sic*] is void, <u>for lack of jurisdiction</u>.'" As DePriest notes in her brief, the *Loughmiller* case does not contain this quote. He also cites *In re Marriage of Johnson*, No. 89,915, 2003 WL 22990188 (Kan. App. 2003) (unpublished opinion) for the proposition that "[f]ailure to scrutinize the DRA by K.S.A. 60-1610[b] **<u>results in a denial of due process.</u>**" Such language clearly does not appear in that case.

14

These are not the only problems with Weaver's brief, but they exemplify the inherent problems in it. Weaver's complete failure to write an adequate brief has caused both our court and likely DePriest and her counsel to expend great efforts attempting to ascertain the particulars of his appeal. It is also difficult to respond to his many incomprehensible statements. Weaver did not file a reply brief addressing these insufficiencies.

Weaver's brief shares many of the same problems as the appellant's brief in *Hoskinson v. Intagliata*, No. 119,575, 2018 WL 6424968 (Kan. App. 2018) (unpublished opinion). There, the pro se appellant failed to include proper cites to support her factual statements, included improper issue statements, failed to state the appropriate standard of review, and failed to support arguments with relevant legal authority, included irrelevant facts, and failed to include a proper record. 2018 WL 6424938, at *3. A panel of our court deemed the issues raised in the brief waived or abandoned based on the appellant's failure to comply with Kansas Supreme Court rules. 2018 WL 6424938, at *4. See *Reynolds v. Kansas City*, No. 119,372, 2019 W 2064497, at *3 (Kan. App. 2019) (unpublished opinion) (dismissing appeal because appellant barely provided citations in his brief, and many of the citations he did include were incorrect and did not provide support for his claims).

Weaver does not get a free pass from observing court rules simply because he is not an attorney. As our court has previously noted:

> "A pro se litigant in a civil case is required to follow the same rules of procedure and evidence which are binding upon a litigant who is represented by counsel. A party in civil litigation cannot expect the trial judge or an attorney for the other party to advise him or her of the law or court rules or to see that his or her case is properly presented to the court. A pro se litigant in a civil case cannot be given either an advantage or a disadvantage solely because of proceeding pro se." *In re Estate of Broderick*, 34 Kan. App. 2d 695, Syl. ¶ 6, 125 P.3d 564 (2005).

Inadequately briefed issues are deemed waived or abandoned, and all of Weaver's issues are inadequately briefed. See *Russell v. May*, 306 Kan. 1058, 1089, 400 P.3d 647 (2017). Although we would have a solid basis for dismissing Weaver's appeal for failure to comply with Supreme Court Rule 6.02(a), we will try, as best we can, to address the issues he is apparently trying to raise. In order to do so, we need to determine precisely what issues Weaver is actually raising.

Reading his brief as a whole, three overarching issues seem to permeate Weaver's brief. First, he asserts that DePriest lied on her DRA and concealed money from the court. Second, he argues that the district court should not have admitted three of DePriest's exhibits. Third, he complains that the district court erred by finding that he dissipated assets. We will address each of these issues in turn.

*DePriest's domestic relations affidavit*

A common theme throughout Weaver's brief is that DePriest submitted a fraudulent DRA (notarized by her attorney, Damore) that omitted several hundred thousand dollars of marital assets. Weaver asserts that by submitting this DRA both DePriest and Damore have committed an act of criminal fraud, and further that Damore has violated the Kansas Rules of Professional Conduct. He asks for both DePriest and Damore to "be arrested for 'theft by fraud', the value being over $100,000 make this a felony." Further, because DePriest "stated in the affirmative to all these lies in court, [she] is also guilty of perjury."

In support of his argument, Weaver asserts that DePriest omitted the following: "Insight/Pershing 'entry value' fraud of ($140,000) difference in value disappeared before rollover to IRA"; "$208,000 in new monies to the retirement accounts"; "$175,000 of Capital Gains from Crested Butte Condo!"; rental income from Highlands Ranch and Pagosa Springs accruing through the time of trial and "accruing still!"; a "secret" SEP

16

IRA; and a Wells Fargo account. He does not explain how he arrived at many of these numbers nor does he support his assertions with appropriate cites to the record, which makes his complaints difficult to analyze. However, the numbers are not material as Weaver's argument on this point is based on a fundamental misunderstanding of domestic relations affidavits.

All parties in a divorce are directed by Kansas Supreme Court Rule 139(a) (2021 Kan. S. Ct. R. 217) to prepare and file a DRA using a form provided in the Kansas Child Support Guidelines. The DRA asks for information on the parties' monthly income, liquid assets (bank accounts and cash), expenses, health insurance costs, retirement benefits, real property, and other assets or debts. Parties may provide either actual values or estimates. Kansas Child Support Guidelines, Appendix III (2021 Kan. S. Ct. R. 153). The DRA provides the court and parties with a snapshot of the assets and debts existing when a party files for divorce, which in this case was October 2016.

Some of the assets that Weaver accuses DePriest and Damore of fraudulently concealing from the district court did not exist at the time she filed. DePriest transferred the funds in her Pershing account to the self-directed IRA, so at the time of filing there was no Pershing asset to report. Similarly, DePriest placed the Crested Butte proceeds with Asset Preservation, Inc. to conduct an Internal Revenue Code 26 U.S.C. § 1031 (2018) like-kind exchange and acquire the Highlands Ranch property. Thus, there was no lump sum of proceeds from Crested Butte to report as an asset because they had been spent. Weaver provides no support for his assertion that DePriest was required to report nonexistent assets on her DRA.

It is unclear what Weaver means by "$208,000 in new monies to the retirement accounts." He does not explain how he arrived at that figure nor does he provide cites to the record. The evidence submitted at trial showed that at the time of filing, DePriest had about $900 in her self-directed IRA and less than a dollar in her Vanguard account.

17

Weaver fails to support his argument that DePriest was "hiding" $208,000 at the time of filing.

Weaver's argument also includes claims that are demonstrably false. He claimed that DePriest failed to list her Wells Fargo bank account on her DRA, but DePriest did in fact list the account in the DRA. He also claimed that DePriest had a "secret" SEP IRA with IRA Services Trust Company, the same company where she had her self-directed IRA. His cite to the record in support of this assertion does not disclose a secret SEP IRA with IRA Services Trust Company. Rather, in the cited testimony DePriest stated that she had a self-directed IRA with IRA Services Trust Company and the SEP IRA with Vanguard. She provided documentation for both accounts showing deposits and distributions. There is no evidence of a second account with IRA Services Trust Company.

Finally, Weaver claims that DePriest failed to report rental income from the Highlands Ranch and Pagosa Springs houses. Before filing for divorce, DePriest received less than one month's rent from the Highlands Ranch property, prorated to $1,096.77. It is not clear from the record where the money was deposited. DePriest began renting the Pagosa Springs property in May 2016, although her first renters could not pay so she had to find different renters. The rental income from that property was deposited into the Blue Moon account. The record shows that at the time of filing, DePriest had earned $6,029.20 in rental income from the property.

DePriest did not explicitly list the rental incomes on her DRA but that does not mean it was not included. She listed the value of the Blue Moon bank account, where the rental income from Pagosa Springs was deposited, on her DRA. Weaver did not elicit testimony as to where DePriest deposited her Highlands Ranch income so he cannot demonstrate that she failed to include it on her DRA. Even if DePriest had not included the rental income on her DRA, Weaver suffered no prejudice. It is clear from the trial that

18

he had the relevant rental agreements and bank accounts needed to know how much rental income Weaver was earning.

Weaver's true argument on this point is not that DePriest failed to list these incomes on her DRA. His real claim is that he is entitled to half of DePriest's rental proceeds accrued during the marriage and after DePriest filed for divorce. Weaver explained his belief at trial, stating, "[T]his was a continuing operation. [DePriest] just doesn't get to say I'm having a divorce, so therefore I get to keep all the rental incomes going forward. Those are still being split 50-50 until this day is done." However, Weaver provides no caselaw in support of his contention that he is automatically entitled to half of the rental income on properties that DePriest bought with premarital funds. In fact, it is merely one of the factors a district court should consider in making a fair and equitable property division.

There is no requirement, as Weaver asserts, that a person list his or her premarital assets or accounts that the person had during the marriage but did not own at the time of filing. The DRA is not intended to be a comprehensive list of every asset brought into the marriage. Further, as DePriest notes in her brief, Weaver did not follow his own rule on this point as he did not include his The Complete Carpenter, Trim Works, or other accounts in his DRA. There is no reason to accept Weaver's argument that DePriest committed a fraud on the court.

*Admission of exhibits*

Weaver's second area of complaint is his contention that the district court erred in admitting three of DePriest's exhibits—Exhibits 2, 6, and 7. Exhibit 2 was a chart showing the value of DePriest's individual property at the time of the marriage, including real estate, vehicles, and retirement plans. For all but one asset (the Bluegreen Vacation Club timeshare), DePriest listed a corresponding exhibit showing where she got the

values for each item. These underlying exhibits were admitted at trial. She testified that she got the value for the timeshare by calling Bluegreen and asking what the timeshare was worth. Exhibit 6 was a single-page chart summarizing contributions to DePriest's self-directed IRA and subsequent transfers to Blue Moon's Bank of America account. She also admitted the bank documents affirming that each transfer listed on the exhibit did in fact occur. Exhibit 7 was a 10-page chart in which DePriest identified the disbursements from Blue Moon's bank account that she was alleging were for Weaver's personal use. Again, she admitted the underlying bank documents showing each transaction.

Weaver's challenge to the admissibility of these exhibits is not properly preserved. Under K.S.A. 60-404, a party must make "a timely and specific objection to the admission of evidence at trial in order to preserve issues arising from that admission for appellate review." *State v. King*, 288 Kan. 333, Syl. ¶ 2, 204 P.3d 585 (2009).

Weaver did not object at all to the admission of Exhibit 2. In fact, he said, "I've got it nailed if this is the best they can do." Regarding Exhibit 6, the district court asked Weaver if he had a legal objection to admission of the Exhibit. He replied, "I don't know objections well enough to know that." When DePriest moved to admit Exhibit 7, Weaver said, "If the petitioner is willing to accept my summaries, I'm willing to accept hers." DePriest's counsel began to respond that she did not know what was in Weaver's summaries so she could not accept them when Weaver interjected and said, "Well, then I can't accept hers."

Weaver objected in a general sense to admission of exhibits that summarized financial documents. For example, when discussing Exhibit 6 he said, "It's a beautiful spreadsheet. Don't get me wrong. I like it. It's sexy. But bank statements are factual and historical documents that was neither." With Exhibit 7 he said that he would "rather have the Complete Carpenter documents because those are truth. This is someone else's

creation." However, he did not lodge any specific legal objections against the exhibits at issue. His failure to do so precludes appellate review of the admissibility of the exhibits.

But even if Weaver had provided a legal objection to the admission of the exhibits, he provides no citation to Kansas law that prohibits the introduction of summary exhibits. "Visual aids are a staple of civil litigation to assist triers of fact in making the appropriate calculations. So long as the information contained in a chart or summary is included in the evidence admitted at trial, their use is not only permissible, but also desirable." *Martinez v. Wally Auto Sales, Inc.*, No. 93,619, 2006 WL 90101, at *5 (Kan. App. 2006) (unpublished opinion). Kansas law also permits summaries of content when there are "multiple or voluminous writings which cannot be conveniently examined in court" as long as the adverse party has a reasonable opportunity to examine the records before trial and the writings are present in court for use in cross-examination. K.S.A. 60-467(a)(2)(F). Here, the documents forming the basis for each summary were voluminous. Further, the underlying documents were not only available for cross-examination but were admitted into evidence. The district court did not err in admitting Exhibits 2, 6, and 7.

DePriest and her counsel did a commendable job preparing the summary exhibits which set forth DePriest's position and evidence in support. Weaver fails to demonstrate any error in their admission.

*Dissipation of marital assets*

As his third major area of complaint, Weaver contends the district court erred by finding he had dissipated marital assets. The district court held that Weaver regularly used his access to the Blue Moon funds for his own personal benefit. It stated:

21

"Mr. Weaver provided nothing to support the costs incurred to build the Pagosa Springs residence: no architect drawings, contractor agreements, invoices, permit fees, license fees, payment for labor, equipment, supplies, fixtures, or anything that would lend validity or credibility to the payments he disbursed from the Blue Moon Investments LLC Bank of America account to his various business entities or directly to himself. To the contrary, the bank statements he did produce are replete with payments that are clearly personal in nature, provided no benefit to Ms. DePriest, and had nothing to do with building the Pagosa Springs residence."

Even though Weaver "was the general contractor and ostensibly in charge of building the Pagosa Springs residence," the district court noted: "[H]e failed to provide any contracts, agreements, subcontracts, purchase orders, invoices, or other documents requested by Ms. DePriest during the course of discovery that would support the costs incurred in constructing the residence." Ultimately, the district court adopted the estimate in DePriest's Exhibit 7, in which she identified funds she believed Weaver took for his personal benefit, and held that Weaver dissipated $130,127.59.

Weaver argues there was insufficient evidence of dissipation. He asserts that the funds DePriest and the district court characterized as dissipation were merely a loss on investment, asserting that DePriest was asking the court "to return monies the defendant never had access too [*sic*] and were dissipated by the Great Recession, this is THEFT BY FRAUD." He states that the money all went toward labor, gas, and construction of the Pagosa Springs residence. He denies spending DePriest's money at restaurants or bars, and asserts that there was "not one check made out to the defendant" from Blue Moon's account.

When a district court is tasked with making a division of property in a divorce proceeding, it must consider a number of factors. K.S.A. 2020 Supp. 23-2802(c). One of these is dissipation of assets. K.S.A. 2020 Supp. 23-2802(c)(8).

22

"To 'dissipate' has a defined and accepted meaning. Black's Law Dictionary 473 (6th ed. 1990) defines dissipate as '[t]o destroy or waste, as to expend funds foolishly.' Webster's New Collegiate Dictionary 366 (9th ed. 1991) defines the term as 'a: to expend aimlessly or foolishly b: to use up esp. foolishly or heedlessly.'" *In re Marriage of Rodriguez*, 266 Kan. 347, 352, 969 P.2d 880 (1998).

A district court has "wide latitude to divide marital property and this latitude provides the judge with discretion to consider whether marital assets were lost as a result of the wrongful conduct of one of the parties to the marriage." 266 Kan. at 352. The district court's property division is reviewed for abuse of discretion. "Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable." 266 Kan. at 352.

There is ample evidence supporting the district court's conclusion on dissipation. The dissipated money can be broken into three general categories: money Weaver transferred to his The Complete Carpenter and Trim Works accounts, money Weaver spent directly from Blue Moon's account, and money spent on the POA lawsuit.

In August 2009, DePriest deposited $235,523.31 into the Blue Moon account. By December 2010, that account had less than $3,000 in it. During this period, Weaver transferred $71,600 to his The Complete Carpenter account. Subsequently, Weaver transferred over $18,000 into his Trim Works account. Bank statements for both accounts were introduced into evidence and show that Weaver used the accounts almost exclusively for his personal benefit. As the district court found, the statements show that Weaver used the funds "for a myriad of personal expenses," including but not limited to convenience stores, gas stations, liquor stores, bars, entertainment, fast food, restaurants, groceries, and lodging.

Weaver argues, without citation to the record, that The Complete Carpenter's bank statements show he used approximately $23,000 for rental equipment, $6,200 at lumber and hardware stores, and $11,500 on laborers. The remaining funds from The Complete

23

Carpenter, he asserts, were split between him and his business partner with Weaver receiving 49 percent and the partner receiving 51 percent. While there are some charges to The Complete Carpenter's account to rental companies, there is no indication of what Weaver was renting. He could have been renting equipment for the construction project, or he could have been renting items for personal use. There are innumerable things Weaver could have rented.

Similarly, while there are checks written to individuals there is no evidence as to whether those individuals worked on the Pagosa Springs residence. The same problem exists for the hardware stores. And, Weaver did not even identify his business partner, or list him or her on the account. Weaver makes no argument regarding the Trim Works expenditures. While he asserts that Trim Works was a woodworking company, the Trim Works bank records he produced show charges for gas stations, liquor stores, restaurants, a veterinarian, and cash withdrawals, among other things. Again, there are occasional charges to hardware or lumber stores but no evidence as to what was purchased or whether it was used in constructing the Pagosa Springs residence.

The evidence also supports the district court's conclusion that Weaver used funds directly from Blue Moon's account for personal items. He argues that there was no dissipation because there were no checks from the Blue Moon account made directly to him. Kansas does not ascribe to such a narrow interpretation of the term dissipation. See *In re Marriage of Rodriguez*, 266 Kan. at 350 (declining to adopt strict test for dissipation). The charges DePriest identified, which correlate to Blue Moon's bank statements, show that Weaver used the Blue Moon account for personal purchases similar to those from The Complete Carpenter and Trim Works accounts.

Weaver also denies responsibility for the charges related to the POA lawsuit. He argues that, because DePriest owns Blue Moon and Blue Moon owns the Pagosa Springs residence, DePriest is solely responsible for the cost of the lawsuit. The problem with this

argument is that it ignores the evidence showing that he was the reason the POA filed the lawsuit. He was responsible for constructing the house, and when he did it incorrectly he caused DePriest to incur legal fees associated with the lawsuit. The lawsuit can be traced to Weaver's poor judgment and workmanship, which justifies the district court's finding that Weaver dissipated the assets spent on the lawsuit.

It is certainly possible that some of the charges identified as monies consumed for Weaver's benefit actually went into the Pagosa Springs residence. But such a conclusion would be based on speculation, because Weaver failed to provide anything beyond conclusory statements in support of his contentions. Even assuming for the sake of argument that he is correct, the district court still acted within its discretion in finding that Weaver dissipated assets. Weaver made tens of thousands of dollars of purchases with DePriest's retirement funds that were obviously not for the Pagosa Springs project. Additionally, Weaver promised to build the Pagosa Springs residence for $250,000 and to have it completed in about six months. After 7 years, over $463,000 in DePriest's funds, and one lawsuit, Weaver still had not completed the residence. Some of the work he did complete was shoddy and had to be fixed by DePriest. While Weaver argues there was no dissipation and that DePriest simply lost money on a bad investment, he fails to acknowledge the evidence showing that he is responsible for the loss.

In short, we find no abuse of discretion in the district court's determination that Weaver dissipated $130,127.59 in marital funds.

Affirmed.

25