Nɪɴᴀ Dᴀᴠɪs LᴀRᴜᴇ, *Appellee,* v. Jᴏʜɴ A. LᴀRᴜᴇ, *Appellant.*

(531 P. 2d 84)

Opinion filed January 25, 1975.

*John L. Richeson,* of Anderson, Byrd & Richeson, of Ottawa, argued the cause, and *Jon J. Indall,* of the same firm, was with him on the brief for the appellant.

*Thomas E. Gleason,* of Ottawa, argued the cause, and *Thomas E. Gleason, Jr.,* of Ottawa, and *F. Duane Roberts,* of Baldwin, were with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an appeal by John A. LaRue (defendant-appellant) from an order of the Franklin County District Court dissolving his marriage with Nina Davis LaRue (plaintiff-appellee) and dividing their property.

The appellant contends: (1) There was no substantial evidence to support the trial court's finding that the parties were incompatible; (2) the trial court erred in giving credence to the appellee's testimony in view of her demeanor; and (3) the property settlement award granted the appellee is not supported by substantial evidence.

Nina Davis LaRue and John A. LaRue were married February 12, 1945. At the time of their marriage Nina was a 56-year-old widow and John was 39. The parties were living in Carthage, Missouri, where Nina managed a hotel and John worked as a projectionist in the hotel theater.

In 1947, the couple moved onto a 210 acre farm northeast of Ottawa, Kansas, owned by Nina. She inherited the farm from her previous husband. The parties farmed the tillable land and raised cattle.

On May 15, 1973, John became ill, and Nina called an ambulance to have him taken to a hospital where he underwent surgery. Upon release from the hospital, John was not permitted by Nina to return to their home. John initially stayed in a motel and then moved into a small boarding home.

On July 6, 1973, Nina sued for a divorce alleging irreconcilable incompatibility. John answered with a general denial, and filed a cross-petition in which he also sought a divorce on the ground of irreconcilable incompatibility. John abandoned his claim for divorce at the trial.

The appellant first asserts the trial court's conclusion that the parties were incompatible is unsupported by the evidence. It is argued the record is void of any showing of temperament that represents the destruction of the parties' marital relationship and the appellee's testimony does not establish an irremediable rift or discord.

The only testimony included in the record on appeal concerning the parties' marital relationship is that of the appellee. She was asked by her attorney why, after 28 or 29 years of marriage, all of a sudden when the appellant went to the hospital, she filed for a divorce. The appellee replied as follows:

". . . Cause he hadn't done anything for so long and I got tired of keeping him and cooking for him, and cooking fish and hamburgers. He couldn't eat anything else and I just decided that I didn't want to do it any longer, I couldn't do it any longer. . . ."

The appellee further stated:

". . . I was so sick and tired of looking at him that I hated him and then I said when I—they took him out of that door, when they took him onto that little back doorstep and I made up my mind this is the last time I want to see you, I am through."

The appellee also complained that the appellant never really did any of the farm work because he was "too damn lazy", and on at least one occasion the appellant refused to assist with the dehorning, branding, clamping of the cattle and the loading for market. The appellee claimed the cattle belonged to her and she had raised them. Furthermore, according to the appellee, the appellant tried to get money from her all the time and he used to get into her pocketbook and take money before she stopped him.

Also indicative of state the parties' marital relationship was the appellee's repeated reference to the appellant as "that thing over there", and descriptions of the appellant such as "dumb" and "lazy".

The appellant argues that the foregoing evidence falls short of establishing the couples' incompatibility.

Recently, this court had occasion to consider incompatibility as a ground for divorce in *Berry v. Berry,* 215 Kan. 47, 523 P. 2d 342. There it was said incompatibility may be broadly defined as such a deep and irreconcilable conflict in personalities or temperaments of the parties as makes it impossible for them to continue a normal marital relationship. The conflict of personalities and dispositions must be so deep as to be irreconcilable and irremediable.

It is also recognized in *Berry,* supra, that incompatibility does not refer to petty quarrels and minor bickerings which are merely evidence of normal human frailty, but refers to conflicts in personalities and dispositions so deep as to be irreconcilable and to render it impossible for the parties to continue a normal marital relationship.

While a divorce should not be granted perfunctorily or merely upon a party's charge of incompatibility without real proof of the fact, undoubtedly the legislature in supplying the additional ground of incompatibility intended to liberalize our divorce laws by broadening the basis upon which it may be granted. (*Berry v. Berry,* supra.)

In our opinion the appellee's testimony sufficiently supported the trial court's finding of incompatibility. Her testimony clearly demonstrates a long-standing, deep-seated dispute between the parties as to work load responsibilities on the farm and financial matters generally. The appellee quite evidently harbors nothing but hostility and resentment for the appellant. It is inconceivable that appellant's temperament can be compatible with the appellee's, if hers is incompatible with his. *(Burch v. Burch,* 195 F. 2d 799 [3rd Cir. 1952].)

The appellant contends the trial court abused its discretion by not requiring corroboration of the appellee's testimony. The appellant states if he is "correct in his contention that there is no evidence on record showing the parties incompatible, the trial court abused its discretion by not requiring corroborating testimony to fill the void of the Appellee's direct testimony."

Actually, the appellant seems to be reasserting his argument that there is insufficient evidence to support the finding of incompatibility. Having already concluded that sufficient testimony exists, this claim has no merit. It was recognized in *Berry v. Berry,* supra, that our law is now changed so that either party may, in the trial court's discretion, obtain a decree of divorce or separate maintenance upon the uncorroborated testimony of either or both of the parties. (K. S. A. 1974 Supp. 60-1609 [*d*].) The record does not disclose any abuse of the exercise of the power of discretion in the instant case.

The appellant contends the trial court erred in the weight and credibility given the appellee's testimony because of her demeanor as shown by the record. It is readily apparent from the record the appellee, 85 years of age at the time of trial, was uncooperative and refused to testify as to the disposition of certain assets; she refused to abide by the court's order restraining her from disposing of liquid

assets; she was evasive, and rude to the court and counsel. However, there is no indication in the record the trial court was deprived of its ability to weigh the evidence and determine this case by reason of the appellee's demeanor during the trial. The point is sufficiently answered by the long standing rule that the district court as the trier of facts in a case, is the sole judge of the credibility of the witnesses and of the weight to be given the evidence presented at the trial. (*Hoppe v. Hoppe,* 181 Kan. 428, 312 P. 2d 215; and *Saint v. Saint,* 196 Kan. 330, 411 P. 2d 683.)

Did the trial court err in dividing the parties' property?

There is no dispute between the parties as to the factual findings of the court. The journal entry discloses after the parties' marriage in 1945, John entered the military service and was discharged on November 2, 1946, when he became 40 years of age. During this time John's allotment was approximately $30.00 per month. Upon release John drew veteran's pay of approximately $20.00 per week until June 13, 1947. Then for two years in 1948 and 1949 he drew $87.50 veteran's training pay.

Nina owned a 210-acre farm northeast of Ottawa which was inherited from Mr. Davis, her first husband who died in 1935. In 1947, they moved to the farm. She states that at the time of the marriage she had "plenty" of money in the bank and bonds "and bought a new car every year." However, she either doesn't remember or refuses to state what her financial status was at that time.

A tractor had been purchased in 1947 while the parties still lived in Missouri. John started farming in 1948 and they bought their first cattle that year. They have tried to keep about twenty stock cows and raise the calves past the weaning age. Except for two years, about 1949 and 1950, when appellant was ill and underwent surgery, he farmed all of the 100 acres of farm ground until about 1957. He continued to farm part of it as late as 1965. His outside work was generally limited to hauling grain for the neighbors in their 1946 International truck.

When the parties moved to the farm, they lived in a log cabin. John built new fences on part of the farm. He quarried the rock for the construction of a 20′ x 60′ barn. Later a house 40′ x 50′ was built partially with funds appellant received from the settlement of his mother's estate in the amount of $7,269.46. A mortgage was placed on the farm in October 1947 apparently to complete the construction of the home and purchase of machinery, in the amount of $5,300. On January 15, 1954, it was consolidated with an obliga-

tion at the Production Credit Association and increased to $8,000.

In 1967, at age 62, John began drawing Social Security with a lump sum payment of $683.30. His benefits started at $60 per month and are now $85.20. He also receives monthly V. A. benefits of $127. In 1955, Nina began drawing Social Security with a lump sum payment of $777. Her benefits started at $51.80 and are now $101.00 per month.

There remains 150 to 155 acres of the farm. Twenty-five acres were taken in 1957 for I-35 at a compensation of $12,300 plus a few hundred dollars for some additional burdens on the remaining tract. This was used to remove the mortgage from the farm and to purchase a 1957 Chrysler for $4,300 which the parties still own.

On May 2, 1973, a preliminary contract was signed by Nina and by Joe Hiatt, a neighbor, for the purchase by the latter of the "landlocked" tract of "33 acres more or less" lying south of I-35 for $4,500 with $500 being paid as "good faith deposit" to the real estate agent. The real estate contract was signed May 3, 1973, by Hiatt and his brother, both single, and Nina and John. At the outset of the trial of this case, the court on December 14 ruled that the agreement constituted a valid contract and adjudged the Hiatts to be the owners thereof upon payment of the balance of the purchase price. The Hiatts have since paid in the balance of $4,000 to apply thereon. Also, the agent has paid in $230, the balance of $500 earnest money after deducting a $270 commission.

On May 15, 1973, John entered the hospital and underwent surgery. When Nina did not permit him to return to the farm, John eventually moved into a small boarding home where he is currently receiving board and room within the total of his Social Security and V. A. benefits. He paid for the ambulance in cash, $22.50. He purchases approximately $5.50 worth of medicine each week. His unpaid medical and hospital bills amount to $1,581.50.

In May or early June, after John entered the hospital, Nina sold some $5,200 worth of cattle. While she refused to testify regarding the disposition of the proceeds, she opened a savings account in Peoples National Bank on June 7, 1973, with a deposit of $5,317.28. Withdrawals were subsequently made as follows:

| | |
|---|---|
| October 3, 1973 | $1,000.00 |
| November 3, 1973, to checking account | 1,894.62 |
| December 14, 1973, to checking account | 1,000.00 |

At the time of trial December 14, 1973, Nina had in her checking account in Peoples National Bank (opened July 5, 1973) the amount of $1,743.29. This account was subsequently, about December 27, 1973, withdrawn and closed by Nina.

The court found that the remaining portion of the real estate is valued at $400 to $500 per acre, or at least $62,000. The court further found the personal property owned by the parties was valued at $24,621.38. Included in this figure was the amount of $1,700 withdrawn by Nina on December 27, 1973, from the Peoples National Bank checking account and $2,999.90 in a savings account. At the time of the trial the corn crop growing on the farm had not been harvested, consequently its value was undetermined.

The outstanding obligations of the parties amounted to $4,660.25. This figure included, among other things, the 1973 real estate taxes, the appellant's medical expense, and the balance due on attorneys' fees for three attorneys.

In the original journal entry, the trial court awarded the farm and all other assets to Nina except that John was granted a judgment against Nina in the amount of $10,000, "being approximately one-half of the [personal property] assets less the obligations as determined in the findings." John also received one-half of the landlord's share of the corn to be harvested.

The journal entry also included a memorandum opinion, which offers some insight into the court's reasoning in dividing the property. It states:

"It is clear that at the time of the marriage twenty-nine years ago, plaintiff owned the 210-acre farm and, no doubt had other assets. Also, until they moved to the farm in 1948, she continued her employment managing a hotel in Carthage, Missouri. The defendant's inheritance of $7,269.46 went into the common venture of the parties, primarily the construction of the residence on the farm. On the other hand, the proceeds from the depletion of the farm from 210 to 155 acres by the taking for I-35 in 1957 and the recent sale of 33 acres south of I-35 has inured to the benefit of both parties. An award to defendant of one-half of the assets other than the real estate will not give him any benefit from improvements of the real estate to which he has contributed physically, as well as financially, and nor of the increase in value thereof over twenty-nine years which has been substantial, it does give him a portion of the assets accumulated during the marriage. While defendant apparently was not a vigorous breadwinner, he has put a reasonable effort into the marriage in farming, caring for the livestock and in improvements, including buildings and fences."

Subsequently, after a hearing on the appellant's motion for new trial or to amend the findings of fact, memorandum of opinion and

conclusions of law, the court amended the award to allow the appellant an additional $800, due to the inadvertent omission of the equity owned by the parties in the Ottawa Cooperative Association, and also some expenditures by the appellee for an attorney prior to commencing this action on a matter not disclosed by the record.

The thrust of the appellant's argument as to the property division is that the trial court erred by looking only to the source of the real property and granting it to the appellee, where the house and barn were built in part from the appellant's $7,269.46 investment (the inheritance from his mother) and his physical labors. It is argued that under K. S. A. 1974 Supp. 60-1610 (b) a court is directed to disregard the source of all income and to place all the parties' assets into a hodgepodge to be equitably and reasonably divided. The appellant contends the trial court abused the exercise of its power of discretion in granting the real property to the appellee and in dividing only the personal property between the parties.

The appellant further argues that if his $7,269.46 investment on the house had been invested elsewhere at 3% simple interest the earnings would have been $6,324.32 for a $13,593.78 total of the principal and earnings, which exceeds his judgment by $2,793.78. It is asserted by the appellant that the award to him is approximately 10% of the net assets of the parties, which is so inadequate and inequitable as to constitute an abuse of the trial court's discretion in dividing the property.

The statute governing the trial court as to the division of property in divorce cases is K. S. A. 1974 Supp. 60-1610 (b). It reads:

"The decree shall divide the real and personal property of the parties, whether owned by either spouse prior to marriage, acquired by either spouse in his or her own right after marriage, or acquired by their joint efforts, in a just and reasonable manner, either by a division of the property in kind, or by setting the same or a part thereof over to one of the spouses and requiring either to pay such sum as may be just and proper, or by ordering a sale of the same under such conditions as the court may prescribe and dividing the proceeds of such sale."

The foregoing section was adopted by the legislature in 1963 (L. 1963, ch. 303) and brought about a change in the prior law.

Under the foregoing section the district court is vested with wide discretion in adjusting the financial obligations of the parties in a divorce action, and its exercise of that discretion will not be disturbed on appeal in the absence of a showing of a clear abuse. (*Stayton v. Stayton*, 211 Kan. 560, 506 P. 2d 1172, Syl. ¶ 1.) One seeking to establish an abuse of discretion assumes a heavy burden,

for "If reasonable men could differ as to the propriety of the action taken by the trial court then it cannot be said that the trial court abused its discretion." (*Stayton v. Stayton,* supra, p. 562.) On the other hand, "The discretion vested in the trial court must be exercised in whole-hearted good faith and be guided by the statutes, not by the court's private opinion of what the statute ought to be. Where the exercise of discretion is arbitrary and not judicial, and the judgment is inequitable, it will be set aside." (*St. Clair v. St. Clair,* 211 Kan. 468, 507 P. 2d 206, Syl. ¶ 6; and *Almquist v. Almquist,* 214 Kan. 788, 522 P. 2d 383.)

In commenting upon the changes in our divorce law wrought by the 1963 enactment of that statute in *Zeller v. Zeller,* 195 Kan. 452, 407 P. 2d 478, the court said:

"The significant change in the law regarding division of property is that the court is no longer required to set aside to the wife the separate property which she brought to the marriage or acquired with her own funds after the marriage. The court now is given authority to divide all of the property owned by the parties, regardless of the source or manner in which acquired, in a just and reasonable manner." (p. 459.)

The foregoing section of the statute was discussed and applied in *St. Clair v. St. Clair,* supra, and in the more recent case of *Almquist v. Almquist,* supra.

Under our decisions the trial court in divorce cases under the foregoing statute is required to make a just and reasonable division of all the property of the parties between them, and in determining a just and reasonable division the trial court should take into consideration the following factors: (1) The ages of the parties; (2) the duration of the marriage; (3) the property owned by the parties; (4) their present and future earning capacities; (5) the time, source and manner of acquisition of the property; (6) family ties and obligations; (7) the question of fault; and (8) the alimony allowance or lack thereof. (*Almquist v. Almquist,* supra, and authorities cited therein.) In *Almquist* the court merely added consideration of "lack of alimony" to the factors to be given weight as previously announced in *Zeller v. Zeller,* supra, and *Saint v. Saint,* 196 Kan. 330, 411 P. 2d 683.

Nowhere in any of our decisions is it suggested that a division of all the property of the parties must be an equal division in order to be just and reasonable, as suggested in the appellant's brief.

In *Almquist* the majority of the court found that the trial court's property settlement order was based upon the "manner of acquisi-

tion" of a parcel of real estate, which it considered to be the sole and controlling factor in determining the disposition of that property. The court there held the trial court's property settlement fell short of the "just and reasonable requirement of the statute" and that such failure constituted an abuse of discretion. The opinion reflects concern for a consideration of the combination of alimony and property settlement awards in determining "just and reasonable" results. In the opinion the court said:

"We do not mean to suggest that the line between alimony and property division drawn in *Drummond* [209 Kan. 86, 495 P. 2d 994] and *Beck* [208 Kan. 148, 490 P. 2d 628] should be blurred. We do think that neither can be fixed by itself, without giving appropriate consideration to the other. Mrs. Almquist was entitled to expect from the court that appropriate weight be given to *all* the factors mentioned in such cases as *Zeller* and *Saint,* and also to the lack of alimony. While she was optimistic about her prospects of self-support, her after-tax earning from all sources for the first nine months of 1972 were only about $200 per month. About half of that came from her real estate work, and the balance from her cooking. Without the homestead to reside in, merely housing herself in Salina will make serious inroads into her income. It seems apparent that in order to survive she will be required to dip into her share of the property. This factor should, we think, have weighed more heavily in the balancing of the parties' over all financial position." (pp. 793, 794.)

In the instant case there is no suggestion in the appellant's brief the findings made by the trial court were not supported by the evidence. The appellant's argument proceeds on minor distinctions in values or suggested omissions from the court's findings. The appellant suggests that a valuation of $500 per acre should have been assigned to the remaining 155 acres of the farm which the appellee inherited from her first husband. The trial court found the real estate should have been valued at $400 to $500 per acre, or at least $62,000. The appellant contends the court failed to account for $5,200, the proceeds of cattle sold in 1973, whereas, the trial court found that $5,200 worth of cattle were sold, and the court associated that sale with the opening of a savings account in the Peoples National Bank on June 7, 1973, with a deposit of $5,317.28. The appellant suggests the trial court considered only the property acquired by the joint efforts of the parties, owned or acquired after the date of the marriage, and contrary to 60-1610 (*b*), *supra.* This suggestion disregards findings made by the trial court wherein the court notes that 25 acres of the farm were taken by condemnation in 1957, and that more than $12,000 received for this property was used to remove the mortgage on the farm and purchase a 1957 Chrysler automobile. The trial court also found a sale of approximately 33

acres of the farm produced $4,500 which went into the assets subject to division by the court.

It should be noted that only 100 acres of the original 210 acres in the farm were tillable, but the record does not reflect how many of the 155 remaining acres were tillable.

A careful review of the record indicates the trial court gave consideration to the foregoing enumerated factors in determining a just and reasonable division of the property. Among these factors the trial court gave consideration to the present and future earning capacities of the parties, and their source of livelihood. That the trial court considered the time, source and manner of acquisition of the property of the parties is adequately reflected throughout its findings of fact.

The matter of obligations were clearly and elaborately considered by the trial court, and the assets in the possession of the appellee were charged with responsibility for meeting all of those obligations. The trial court even reconsidered this matter after hearing the motion for a new trial, and specifically charged the appellee with obligations that may have been considered her separate obligations, although the appellant's individual obligations relative to medical treatment were made a responsibility of the appellee by the trial court.

The only reference to alimony in the record pertains to the appellant's motion for temporary alimony and the trial court's order of August 24, 1973, which continued indefinitely the appellant's motion for temporary alimony, but required the appellee to pay at that time $300 to be applied on the appellant's attorneys fees.

The 155 acre farm provided a home for the appellee and it provided her only source of income, other than her meager social security benefits of $101 per month at the time of trial. She was 85 years of age, seventeen years older than the appellant. The appellant had social security benefits and a V. A. pension amounting to a total of $212 per month at the time of trial.

The trial court reviewed and considered all of the factors which this court has indicated as elements to be considered in determining a just and reasonable property settlement. Its action was not arbitrary or unreasonable. The record discloses substantial evidence to support the district court's findings, conclusions and a judgment.

The judgment of the lower court is affirmed.

FONTRON, J., dissenting: It is a formidable task to dissent from one of Mr. Justice Schroeder's monumental opinions, but the attempt must be made nonetheless. I shall confine my remarks to the property division made by the trial court, overlooking the paucity of evidence showing mutual incompatibility.

When judgment was entered in this action our decision in *Almquist v. Almquist,* 214 Kan. 788, 522 P. 2d 383, had not come down. In that case we pointed out specifically that all property constituting part of the family estate, regardless of source, should be taken into account in arriving at an equitable division of the marital assets. The trial court, of course, could not have foretold our opinion in *Almquist.* Hence, it is my opinion this case should be remanded for reconsideration of the property division in the light of *Almquist.*

In my view, the facts in the case at hand are very similar to the facts in *Almquist,* except that here the source of the farm is found in the wife, rather than in the husband. This difference is not material since what was sauce for the goose in *Almquist* should be sauce for the gander here.

The record in *Almquist* disclosed that some twenty years before the divorce the husband's parents deeded him the farm, referred to as the "home place", on which the Almquists made their home and raised their family. Shortly before the marriage broke up the husband inherited an interest in the estate of his mother, which was still being probated. The trial court gave certain items of property to the wife and others to the husband, but the list did not include either the home place or the husband's interest in his mother's estate. These two items, which had a total value of $115,849, were awarded to Kenneth Almquist, and we said:

". . . Apart from these two items [the home place and the interest in the estate] Kenneth received $56,584 in jointly accumulated property, against which he was to pay $28,250, or just about one-half, in cash. If this were all, Mrs. Almquist would obviously have little ground for complaint.

"This, of course, is not all. Mrs. Almquist's chief complaint goes to the fact that in making the property division the trial court apparently first set aside to her husband the home place and his interest in his mother's estate, and apportioned only the balance. In so doing, she says, the trial court abused its discretion." (p. 791.)

As to Kenneth's interest in his mother's estate we could not "say that it should necessarily have been subject to division" considering its source and recent acquisition, but our ruling as to the home place, was quite a different matter. Concerning this farm, we said:

". . . This property, as we see it, was part and parcel of the family assets, regardless of its source." (p. 792.)

". . . Mrs. Almquist was entitled to an equitable portion of *all* property which might fairly be deemed part of the family estate. This would include, under the facts in this case, the family home. Any other result would, in our opinion, fall short of the statutory demand that the property settlement be 'just and reasonable.' " (p. 794.)

The present case fits well within the *Almquist* pattern. In a memorandum of opinion the trial court said:

". . . An award to defendant of one-half of the assets other than the real estate will not give him any benefit from improvements of the real estate to which he has contributed physically, as well as financially, nor of the increase in value thereof over twenty-nine years which has been substantial, it does give him a portion of the assets accumulated during the marriage. . . ."

The personal assets, less indebtedness, amounted to approximately $20,000. The trial court awarded the personal property to plaintiff and gave defendant a judgment for $10,000. In other words what this court did was to award all the real estate to the wife and split the personal property half and half—as had been done in *Almquist*.

For some 29 years this couple had made their home on the land which plaintiff brought to the marriage. The evidence clearly shows that LaRue did substantial work on and about the property, and sank his entire inheritance in its improvement. The cattle, from which it may fairly be assumed most of the accumulated assets were derived, were purchased after the couple moved to the farm and Mr. LaRue is shown to have cared for them and their offspring for many years thereafter.

It occurs to me that the defendant has received scant consideration from a bad tempered old lady who met him at the door with a shotgun upon his return from a sojourn in the hospital. She now emerges from the twenty-nine year old marriage with a farm worth at least $62,000, plus one-half in value of the personal property acquired over the years, while Mr. LaRue comes out at the short end of the horn with the other half of the value of the personalty, or $10,000. The equities of the situation escape me.

In preparing this dissent, I recognize the superior position occupied by the trial court in viewing the witnesses and listening to their testimony. I also have great respect for Judge Coffman's integrity

and judgment. He did not, however, have the benefit of our opinion in the *Almquist* case. For this reason, I respectfully dissent from so much of the opinion as relates to division of property. I would return the case for reconsideration as previously indicated.

FATZER, C. J., and OWSLEY, J., join in the foregoing dissent.