NOT DESIGNATED FOR PUBLICATION

No. 123,563

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

IN THE MATTER OF THE MARRIAGE OF
KELLI C. ZILLINGER,
*Appellee*,

and

KERRY J. ZILLINGER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Cherokee District Court; OLIVER KENT LYNCH, judge. Opinion filed March 11, 2002. Affirmed.

*Alyssa C. Brockert*, and *Thomas E. Hayes*, of Wallace Saunders, Chartered, of Overland Park, for appellant.

*Katie McClaflin*, of Manson Karbank McClaflin, of Overland Park, for appellee.

Before MALONE, P.J., POWELL and ISHERWOOD, JJ.

PER CURIAM: After nearly eight years of marriage, Kelli C. Zillinger filed for divorce from Kerry J. Zillinger. Before, and during, their marriage, Kerry worked as a farmer and cattle rancher. During the marriage, Kelli helped him with the farming and ranching while also assisting in the management of a temporary nursing agency which Kerry owned.

1

After considering the parties' premarital assets and liabilities and the parties' marital property, the district court granted the divorce and divided the property in a way that essentially gave each party half of the assets—once liabilities were accounted for. Unhappy with that division of assets and liabilities, Kerry appeals.

FACTUAL AND PROCEDURAL BACKGROUND

Kelli Zillinger (née Cobb) met Kerry Zillinger in February 2008. At the time, Kelli lived in Ozark, Missouri, while Kerry lived about 500 miles away in Phillipsburg, Kansas. Kelli began helping Kerry with his farming operations that summer but was not paid for her work until September 2008.

Kerry and Kelli got married in August 2010. Kelli petitioned for divorce in March 2018. After a trial, the district court granted the petition for divorce and divided the property between the parties.

The district court entered its order in November 2020. It noted that Kerry owned premarital real estate in Phillips and Rooks County, Kansas, where he farmed and had cattle. As of 2010, Kerry's real estate was valued at $1,234,000. His liabilities at the time of the marriage totaled $711,590.

A few months after Kerry and Kelli's romantic relationship began, Kelli left full-time employment with Community Hospices so that she could travel to Phillips County to assist Kerry with his cattle and farming operations. In late 2008, Kelli began working full-time for Signature Nurses, Inc. (SNI), a temporary nurse staffing agency that Kerry established in 2001. Kelli managed the business from 2008 to 2010 and then returned to devoting her time to the farming and cattle operations. Kelli returned to SNI in 2014 and worked there periodically until Kerry and Kelli sold SNI in June 2016 for $366,785 in cash payments and two notes totaling $99,000.

2

In 2013, Kerry and Kelli bought land in Cherokee County hoping to expand their cattle herd. They also bought more land in Phillips County. In total, during the marriage they bought five parcels in Cherokee County and one parcel in Phillips County. High Plains Farm Credit was the lender for each purchase.

In 2015, Kerry and Kelli sold their farming machinery in Phillips County, stopped farming, and instead focused on their cattle operation. They leased the Phillips County property for cash and a share of the calf crop.

The marriage began to deteriorate, and in February 2018, Kerry blocked Kelli from participating in the cattle operations. Kelli petitioned for divorce in March of that year. Kerry managed the cattle operation, land leases, and income and expense of the property during the divorce proceedings.

The district court entered temporary orders in early March 2018 and directed Kerry to pay Kelli $1,500 per month as temporary maintenance.

In reaching its final decision on the allocation of property, the district court noted that it considered the testimony, exhibits, and arguments of counsel. When other evidence did not establish values, the court relied on Kelli's exhibit which the court described as a "comprehensive balance sheet prepared by [Kerry] for his lender High Plains Farm Credit to establish premarital values." For final valuations, the district court considered the parties 2017 Balance Sheet, signed by both parties in December 2017. A balance sheet prepared by Kerry two months after Kelli filed for divorce was not considered by the district court.

The district court found that Kelli's premarital assets included her home in Missouri, which had $60,000 in equity, her retirement account worth $63,546, her

nonretirement savings worth $10,028 and a nominal amount for her used vehicle and cash.

The district court found that Kerry had a retirement savings of $73,502, a life insurance policy with a surrender value of $7,277, and nonretirement savings worth $45,877. The court also noted that Kerry had real estate worth approximately $1,234,000 in 2010 and that the value of the real estate was worth around $1,684,000 in March 2018, a $450,000 increase. The premarital real estate was awarded to Kerry with a value of $360,000, which reflected a 20% reduction for cost of sale and income tax.

As for marital property, the district court found that the parties bought five parcels of land in Cherokee County and one parcel in Phillips County during the marriage. The Phillips County parcel was valued at $49,000. The five Cherokee County parcels were given a total combined value of $1,393,150. The district court split the marital property between the parties, giving Kelli three parcels with a combined value of $740,750, which was reduced by 20% for cost of sale and taxes to $592,600. The rest of the marital real estate, with a valuation of $701,500, or $561,200 after a reduction for costs and taxes, was awarded to Kerry.

When SNI was sold in 2018, the net proceeds of the sale were $366,785. The buyer also financed a portion of the sale directly with the parties and continued to make regular payments. The balance of the note was around $84,798 when the petition for divorce was filed. The proceeds already received were included in the marital estate and the district court awarded the remaining balance to Kelli.

The district court also valued the machinery, vehicles, and equipment of the parties. The court valued the farm equipment included in the parties' 2017 Balance Sheet at $209,500 but reduced the amount by 20% to a value of $167,500 to cover the cost of sale and taxes. The farm vehicles in a 2010 Balance Sheet were valued at $120,000 but

4

that was reduced to $64,500 in the 2017 Balance Sheet. After adjusting for costs and taxes, the court found that the 2017 value was negative $50,800. The remaining vehicles and the negative balance were awarded to Kelli. Kelli was also awarded her personal vehicle, valued at $5,000.

Before the marriage, Kerry owned cattle valued at $185,050. By November 2017, that value had increased by $220,850 to a total value of $405,900. The district court awarded Kerry the cattle.

During the divorce proceedings, Kelli received $50,000 which the district court awarded to her. She also contributed $100,000 of her premarital funds to the marital estate which the district court credited to her. Kelli also bought a home during the proceedings which was awarded to her with no assigned value.

Kerry's mutual fund account had a premarital value of $470,580 and when Kelli filed for divorce it was worth around $793,313. The increase was reduced for taxes and the district court split the remaining $258,186 and awarded Kelli $122,859.61 and awarded Kerry $135,326.39. The premarital balance was awarded to Kerry. Kelli's investment account had an increase, after being reduced for taxes, of $30,322 which was awarded to her in its entirety.

Each party had an IRA, which the district awarded in the entirety to the respective party after a reduction for taxes. Kelli's increased $43,956 and Kerry's increased $120,052.

The district court awarded each party their respective personal bank account and made it clear that they were responsible for their debts incurred in their names after the proceeding was filed.

Each party was awarded their own life insurance policy. Kerry's had an increase in surrender value of $8,748 which was also awarded to him.

Any other assets were split evenly between the parties. Personal effects were awarded to the proper owner.

Kerry had $711,590 in debt before the marriage which had increased to $1,466,276 by 2017. The district court ordered Kerry to pay the entirety of the debt and the marital increase, $868,908.78, was credited to Kerry in the division of assets.

The district court did not order Kerry to pay permanent maintenance to Kelli, but the court did order that temporary maintenance "shall continue until clear title to the real estate awarded to [Kelli] is established by release of mortgages and otherwise."

The district court included an exhibit listing the division of assets and debts which is reproduced below.

|  | [Kelli] | [Kerry] |
| --- | --- | --- |
| Premarital Real Estate (Increase in Equity) |  | $360,000 |
| Marital Real Estate | $592,600 | 561,200 |
| SNI Notes |  | 84,798 |
| Farm Equipment and Machinery |  | 167,600 |
| Farm Vehicles |  | (45,200) |
| Cattle |  | 220,800 |
| Funds Advanced to [Kelli] | 50,000 |  |
| [Kelli's vehicle] | 5,000 |  |

| | | |
|---|---|---|
| Trivent Mutual Funds Account | 122,859.61 | 135,326.39 |
| [Kelli's] Contribution to Marital Estate from Sale of her Premarital House | (100,000) | |
| IRA Income [Kerry] | | 120,052 |
| IRA Income [Kelli] | 43,956 | |
| [Kelli's] Edward Jones Account | 30,000 | |
| Cash Value Increase in Life Insurance | | 8,748 |
| Marital Increase in Debts | | (868,908.78) |
| TOTALS | $744,415.61 | $744,415.61 |

After the district court entered its order, Kerry moved for reconsideration and requested that the district court alter or amend its judgment. He also filed a notice of appeal before the district court had a chance to rule on his motion.

The district court denied Kerry's motion in January 2021. The Journal Entry denying the motion was filed in February 2021.

ANALYSIS

The primary focus of Kerry's appeal relates to the district court's division of property. He does include an additional claim that the district court erred in extending temporary maintenance.

To the extent that his arguments relate to the division of property, K.S.A. 2020 Supp. 23-2801 et seq. controls the district court's actions. A district court has broad

discretion when adjusting the property rights of the parties involved in a divorce action. As a result, the district court's property division is reviewed for abuse of discretion. *In re Marriage of Vandenberg*, 43 Kan. App. 2d 697, 715, 229 P.3d 1187 (2010).

When dividing property after a divorce, the district court:

"shall consider: (1) The age of the parties; (2) the duration of the marriage; (3) the property owned by the parties; (4) their present and future earning capacities; (5) the time, source and manner of acquisition of property; (6) family ties and obligations; (7) the allowance of maintenance or lack thereof; (8) dissipation of assets; (9) the tax consequences of the property division upon the respective economic circumstances of the parties; and (10) such other factors as the court considers necessary to make a just and reasonable division of property." K.S.A. 2020 Supp. 23-2802(c).

The district court is not required to equally divide the property; however, the division must be just and reasonable. *LaRue v. LaRue*, 216 Kan. 242, 250, 531 P.2d 84 (1975).

A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *Biglow v. Eidenberg*, 308 Kan. 873, 893, 424 P.3d 515 (2018).

DID THE DISTRICT COURT ARRIVE AT FLAWED CONCLUSIONS FOLLOWING ITS CONSIDERATION OF THE TIME, SOURCE, AND MANNER OF ACQUISITION OF MARTIAL PROPERTY?

In his first issue on appeal, Kerry argues the district court erred when it failed to credit him with premarital contributions of machinery and equipment; liquid assets and prepaid expenses; and growing crops and farm produce to the marital estate. He also argues that the district court erred when it credited Kelli $100,000 for contributions to

8

premarital property to the marital estate and that the district court erred when valuing the marital debt of the parties.

### a. Premarital machinery and equipment

Kerry argues that the trial court erred because it did not assign a value to the premarital machinery, corn crop, or produce held for farm use. According to Kerry's 2010 balance sheet, his machinery and equipment was worth $288,500. Most of Kerry's premarital farming machinery and equipment was sold at auction during the marriage. In his brief, Kerry contends that he demonstrated for the district court that when the equipment was sold it was reinvested in equipment in Cherokee County. According to Kerry, the parties' 2014 and 2015 tax returns show a total value of $197,636 for the liquidated premarital equipment.

Kerry argues the district court abused its discretion by crediting Kerry with the value of the marital equipment and machinery without considering that Kerry's premarital assets provided the financial means to enable the parties to acquire those marital assets. In response, Kelli argues that Kerry ignores the fact he also had substantial debt related to that premarital machinery and equipment that the couple paid off during the marriage which ultimately resulted in equity in the equipment. Kelli notes that Kerry failed to provide evidence to support his contention that his premarital property, or the proceeds of the sale of his premarital property, was what was used to purchase the new farm machinery and equipment.

In general, a district court may set aside an asset to a particular party, even if that asset was obtained during the marriage, if the asset can be directly traced to that one party and there is a reason that the asset should remain with that specific party. For example, in *In re Marriage of Hair*, 40 Kan. App. 2d 475, 480-82, 193 P.3d 504 (2008), the respondent in a divorce action received an inheritance, while married to the petitioner,

9

after his father died. As part of the inheritance, the respondent received a certificate of deposit (CD) worth around $53,000. The CD remained in the same form it was received while the rest of the inheritance was comingled in the couples' bank account. The district court, after considering local guidelines which promoted leaving gifts from one party's family with the party, awarded the respondent the entirety of the CD as part of the division of property. 40 Kan. App. 2d at 481. On appeal, this court affirmed the district court's decision, finding that the decision was not an abuse of discretion. 40 Kan. App. 2d at 482.

The situation here differs from that in *Hair*. Here, there is no clear path to trace the premarital value of Kerry's equipment and machinery and how the proceeds of the sale of that equipment and machinery were used. While Kerry testified that the proceeds from the sale of equipment was "reinvested in equipment here in Cherokee County" that does not necessarily establish that *only* that money was used for purchasing new equipment or that no other money was included to make that purchase. Not only that, as Kelli points out in her brief, the issue is compounded by the debt associated with the machinery and equipment which Kerry glosses over.

The district court did not abuse its discretion by crediting the value of the machinery and equipment to Kerry. See *Biglow*, 308 Kan. at 893.

### b. Premarital contributions of liquid assets and prepaid expenses

Kerry next argues that the district court erred by not crediting him with other premarital assets including:

"(1) cash and savings in the amount of $7,500; (2) accounts receivable in the amount of $7,940; (3) produce held for farm use in the amount of $32,300; (4) prepaid expenses in the amount of $14,000; (5) investment in growing crops in the amount of $30,400; and (6) other current assets in the amount of $54,989."

10

He also contends that SNI's accounts receivable had a value of $99,804 that the district court failed to credit to him. Kerry specifically asserts that the district court erred by not crediting him the cash, accounts receivable, prepaid expenses, and "other current assets" for a total of $184,233. Those "other current assets" consisted of a cash collateral and an installment escrow, which Kerry testified was in an escrow account as prepayment for a debt he owed.

Kelli argues that Kerry's proposed division of property before the district court did not seek credit for the SNI accounts receivable and that he should not be allowed to change his argument to seek credit for those assets on appeal. Given that, we adhere to our sound, long-standing rule that when a party fails to raise an issue before the district court it cannot be raised on appeal. *Gannon v. State*, 303 Kan. 682, 733, 368 P.3d 1024 (2016).

### c. Premarital contributions of growing crops and farm produce

Like his earlier arguments, Kerry argues that the district court erred when it did not credit him for his stored crops, which were allegedly valued at $32,300, and for his planted corn which purportedly had an "investment value of $30,400." Kelli argues that Kerry failed to prove the value of the stored or growing crops, that any proceeds they realized from the crops had already been spent, and Kerry could not trace those proceeds to any existing asset.

As for the value of the assets, the 2010 Balance Sheet sets out the value of the stored crops and the investment in growing crops. But as Kerry admits in his brief, he "was unable to trace these assets to a specific marital asset." He then seeks to circumvent this deficiency by directing our attention to Nebraska case law.

In *Brozek v. Brozek*, 292 Neb. 681, 698-99, 874 N.W.2d 17 (2016), the Nebraska Supreme Court held that the husband was not entitled to a setoff for his premarital crop harvest because he could not trace the proceeds from the crop. Instead, the proceeds from the premarital crops rolled over into his next years' planting and that process continued for years.

But the Nebraska Supreme Court differentiated the case in *Brozek*, where the husband could not establish a certain value of the premarital crop, the premarital crop was not a significant portion of the estate at issue, and the marriage lasted nearly 20 years, with *Osantowski v. Osantowski*, 298 Neb. 339, 357-58, 904 N.W.2d 251 (2017). In *Osantowski*, the husband successfully identified the values of his premarital assets, which were nearly 87% of the net marital estate, the marriage lasted less than three years, and only two crop cycles occurred. Given those factors, the Nebraska Supreme Court held the district court erred when it failed to set off the value of the husband's premarital bank account and crops. 298 Neb. at 358.

Finally, in *Chmelka v. Chmelka*, 29 Neb. App. 265, 278, 953 N.W.2d 288 (2020), the Nebraska Court of Appeals applied *Brozek* and *Osantowski* and held that the district court did not err when it set off the husband's premarital stored grain and farm inputs when dividing the marital estate. *Chmelka*, 29 Neb. App. at 279-80. In doing so, the *Chmelka* court noted that the husband's testimony and supporting documentation demonstrated "the exact quantity of grain and supplies he owned, as well as the value of the assets at the time of the marriage." 29 Neb. App. at 280. The court acknowledged that the husband "could not perfectly trace the proceeds he derived from the stored grain" but because he could establish the exact value of the grain and the wife did not contradict the evidence, it was not an abuse of discretion to exclude that value from the calculation of the husband's assets. 29 Neb. App. at 280.

But the value of the Nebraska cases Kerry cites is extremely limited because Kansas treats the division of property in a divorce case quite differently. The overarching theme when dividing assets in a Kansas divorce is that the division must be just and reasonable. K.S.A. 2020 Supp. 23-2801(c). Kerry does not argue that the district court made an error of law or an error of fact when it failed to credit him with his premarital growing crops or produce. Thus, he must establish that the decision was unreasonable. After a comprehensive review of the record and fair consideration of Kerry's arguments on appeal, we are unable to conclude that Kerry has established the district court's decision was unreasonable, especially given the difficulty of tracing the assets or proceeds from those assets.

### d. Crediting Kelli with $100,000 in premarital contributions

Kerry's next contention of error consists of a claim that the district court erred when it credited Kelli $100,000 as a contribution from the sale of her premarital house.

The district court acknowledged in its order that Kelli's premarital home had equity in the amount of $60,000. And at trial, Kerry testified that Kelli drew $100,000 in equity from her premarital home to put a down payment on marital real estate. But Kerry argues that Kelli was only able to do so because she "used the entirety of her salary from [SNI] and the farming operation to pay down the mortgage" on her premarital property. However, the citation he provides to the record to support this proposition does not reflect his assertion. Kelli acknowledged that she used marital funds to pay down the debt on her premarital home, but the portion of her testimony that Kerry directs us to does not reference the precise amount that Kelli paid with marital funds.

In her testimony, Kelli explained that she sold her premarital home and received around $73,000 in proceeds from the sale which she then directed into an investment account. But she also stated that before she sold the home, she took $100,000 in equity

13

out of the premarital home to put the down payment on their marital property, just as Kerry acknowledged in his testimony.

As for the investment account where Kelli deposited the proceeds of the home sale, Kerry argues that because the district court awarded the balance of that account to Kelli the district court then essentially double dipped when it credited the money to Kelli. But in the end this argument is essentially immaterial.

Kerry provides no support for his contention that the district court's decision to credit Kelli with $100,000 in premarital contributions constitutes an error of law, error of fact, or is otherwise unreasonable. Testimony established that Kelli used $100,000 worth of equity in her premarital home to help pay for marital property. And as already discussed, the district court has broad discretion when determining how to split property in a divorce proceeding. We cannot conclude from the information and arguments before us that the district court's decision to credit Kelli with $100,000 in premarital contributions is unreasonable under the circumstances. Kerry failed to sustain his burden to show that the district court abused its discretion.

### e. Value of the marital debt

For his next argument, Kerry asserts that error occurred when the district court calculated the marital debt of the parties because it neglected to consider evidence of additional debt incurred by the parties during the marriage and failed to credit him with the entirety of the debt during the marriage. Specifically, Kerry takes issue with the district court assigning the entire debt of $1,466,276 to him but only crediting him with the marital increase of debt $868,908.78.

In its order, the district court relied on the parties' 2017 Balance Sheet to determine the current amount of debt. According to that document the parties owed:

$405,278 on the loan ending with 3516; $4,194 on a Ford Motor Credit loan; $366,255 on loan ending in 2606; $256,888 on loan ending with 9926; $293,424 on loan ending with 0219; and $92,733 on loan ending with 2186. The total liability of those listed loans was $1,418,772. The aggregated debt list shows a total liability of $1,465,276, or the $1,418,772 in debt plus the accrued interest of $46,504.

On appeal, Kerry argues that there was evidence presented at trial that contradicted the 2017 Balance Sheet. The first of which is evidence regarding the "Beasley" property, which Kerry contends the parties purchased after the 2017 Balance Sheet was prepared. But the record directly contradicts Kerry's assertion. Kelli testified that the "Beasley" property had a legal description of "21-34-23" and that same description is reflected in the 2017 Balance Sheet.

Next Kerry focuses on the error he alleged occurred when the district court credited him with the marital increase of the debt because the district court allegedly miscalculated. The district court found that Kerry's premarital debt was $711,590 and credited him with the marital increase in the debt, which the district court stated was $868,908.78. But if the stated premarital debt is subtracted from the total debt of $1,466,276, as the district court read in the 2017 Balance Sheet, you get a total of $754,686, not $868,908.78.

The record reflects that the district court arrived at its marital increase in debt value by subtracting Kerry's premarital debt, $711,590 as listed in the 2010 Balance Sheet, from his total debt value which he included in his proposed property settlement and valuation sheet which listed his debts at $1,580,498.78 as of March 2018. Subtracting $711,590 from $1,580,498.78 yields a figure of $868,908.78, the same amount the district court arrived at for the marital increase in debt.

15

Finally, Kerry argues that the increase in debt on his account ending in 3516 and his Ford Motor Credit account should likewise have been credited to him. However, it appears from the district court's ruling that it determined Kerry would be responsible for the parties' debts and he would be credited for the increase in the marital debt. Determining the increase in the marital debts, as shown above, essentially involves subtracting the premarital debt value from the debt value at or near the time of divorce. The district court did so by using the total debt value provided by Kerry in the 2010 Balance Sheet, along with his proposed property settlement and valuation. If he failed to include those debts in his proposed settlement and valuation such fault does not lie at the feet of the district court.

Ultimately, as we reiterated several times, the district court has broad discretion in dividing the property between divorcing properties. The district court's division of property must only be just and reasonable. *LaRue*, 216 Kan. at 250. There is no indication the district court abused its discretion when it calculated the marital increase in the debt based on the varying evidence before it. The decision cannot be characterized as unreasonable.

DID THE DISTRICT COURT ERR BY FAILING TO CONSIDER THE TAX CONSEQUENCES OF CERTAIN PROPERTY AWARDED TO KERRY?

In his second main issue on appeal, Kerry seeks to persuade us that the district court erred when it "(1) failed to consider the tax consequences of the award of the cattle to [Kerry]; and (2) erroneously applied a reduction in value for investment accounts that would not incur tax liability upon liquidation."

Kerry takes the position that the district court should have applied a 20% reduction in value for tax purposes for the cattle just as it did for the farm equipment, machinery, and vehicles. He asserts this financial consideration is critical with respect to the cattle

16

because he relies on livestock sales for his income, a factor that is of particular note given that the district court assigned the marital debts to him and ordered him to continue paying temporary maintenance.

Kelli counters that no error occurred because Kerry, through various accounting methods, generally pays minimal amounts in taxes. In support of her contention, Kelli highlights the testimony of Brian Thompson, Kerry's CPA, as well as their tax returns from 2010 through 2017.

Thompson assisted Kerry with preparation of his tax returns beginning in 2009. Thompson testified that, depending on the total gain and income level on a yearly basis, Kerry could face 23.8% in federal capital gains tax and 5.7% in Kansas capital gains tax, and that those rates would apply to any land and capital assets. But Thompson also testified that the tax rates would only become relevant if Kerry made $434,000 or more per year. Thompson informed the court that in the 2017 tax year Kerry had an income of negative $98,000, which would translate to no capital gains tax, because he suffered a farming loss of $185,144 which contributed to his negative income. Thompson noted that Kelli would be unlikely to receive the same tax benefits because she would be less likely to operate a farm at a loss.

Similar incomes are reflected in Kerry's and Kelli's tax returns throughout their marriage. In 2010 and 2011 for example, the couple reported a negative income. In 2012, they reported an income of just over $71,000 and paid $4,000 in taxes. In 2013, the two had income around $18,000 and paid no other taxes outside of their withholdings. Their income for 2014 was a little more than $100,000, after posting a $146,000 farm loss, and they received a tax refund based on their withholdings. In 2015, they reported an income of nearly $49,000, after posting a farm loss of more than $400,000, and received a refund based on their withholdings. In 2016, the couple had an income of nearly $540,000, after

posting a farm loss of $230,000. And in 2017, consistent with Thompson's testimony, Kerry's return reflected a negative income and he would not have paid a capital gains tax.

When dividing assets in a divorce proceeding, the district court is required to consider the tax consequences of the property division based on the parties' respective circumstances. K.S.A. 2020 Supp. 23-2802(c)(9). But there is no requirement that the parties be treated the same with regard to tax considerations. Based on the record before us, we have no reservations in concluding that the district court adequately considered the tax consequences in the division of property with respect to the cattle awarded to Kerry. The district court made a reasonable decision when it opted not to reduce the value of the cattle to reflect tax implications.

Kerry next challenges the district court's decision to reduce the value of his Thrivent mutual fund account and Kelli's Edward Jones account because withdrawals from those accounts are not taxed. He also argues that the district court erred when it reduced only the increase in value of his premarital property by 20% for tax purposes as opposed to the value of the entire property. But he provides us with no citation to the record which shows where he made these arguments to the district court. His argument on appeal relies on references to the federal tax code but if those arguments were not made to the district court, he cannot expect the district court to have considered them. When a party fails to raise an issue before the district court it cannot be raised on appeal. *Gannon v. State*, 303 Kan. at 733.

As it stands, the district court heard evidence from both parties as it related to the valuation of certain portions of their marital and premarital property and the impact some of that had on their taxes. Based on that information the district court arrived at a conclusion that we are not prepared to find unreasonable under the circumstances. Kerry again failed to demonstrate that the district court abused its discretion. See *Biglow*, 308 Kan. at 893.

18

DID THE DISTRICT COURT ERR BY FAILING TO CONSIDER THE DURATION OF THE PARTIES' MARRIAGE?

For his next argument on appeal, Kerry argues that the district court erred by failing to consider the length of the parties' marriage when deciding on an appropriate division of their property. For support, he cites *In re Marriage of Rindels*, No. 100,940, 2010 WL 445691, at *6 (Kan. App. 2010) (unpublished opinion), where a panel from this court noted that a relatively short marriage weighs heavily in favor of a property division that is closer to the parties individual assets rather than an equal division. Likewise, when one party brings a majority of the assets into such a marriage that party should in turn receive the majority of the assets at the dissolution of the marriage.

Here, it is undisputed that Kerry brought significantly more assets into the marriage. He contends that given the fairly brief duration of his and Kelli's marriage, the district court abused its discretion when it sought to essentially split their property equally.

For her part, Kelli argues the court heard extensive testimony relating to her contributions to the parties' assets throughout their marriage. For example, she points to the fact that she played an integral role in maintaining SNI's operations when the couple experienced significant business problems. She also notes that she assisted with the farming and ranching operations for the duration of their relationship.

Under the circumstances presented the district court's decision to divide the property as it did was not unreasonable. A different judge may have arrived at a different conclusion, and it is certainly not the division that Kerry hoped for, but that is not the standard which governs. The district court was aware of the length of the parties' marriage and nevertheless determined that its division was just and reasonable. Kerry provides nothing that tends to show the district court is required to divide assets in a

19

manner that is similar to how many assets each party brought into a marriage that ends in a relatively short period of time. *Rindels* merely states that the length of the marriage weighs heavily in favor of doing so, but that does not translate into a mandate. Given the circumstances in this case, Kerry has not shown that the district court failed to properly consider the length of the parties' marriage and, therefore, abused its discretion in its division of assets. See *Biglow*, 308 Kan. at 893.

DID THE DISTRICT COURT ERR BY FAILING TO CONSIDER THE CIRCUMSTANCES OF THE PARTIES AND THE PARTIES' WISHES WHILE DIVIDING THE PROPERTY?

Next, Kerry argues that the district court erred because it failed to take the parties' wishes into consideration when it split up the farming and ranching real estate between the parties, and allocated all of the debt, including the land loans, to him.

First, Kerry asserts that public policy strongly favors keeping a farm or ranch intact and operating during and after a divorce. He also notes that at the time of trial, Kelli testified that she was not in a position to operate a ranch and asked that the properties be set aside to Kerry. Kerry acknowledges that there is no requirement to keep the property intact yet still cites to several Montana and Iowa cases in support of his argument. But as Kelli points out this case does not illustrate a situation in which the district court split up the family farm. Rather, the judge merely awarded her parcels of land that the couple acquired during their marriage.

Kerry raises the additional complaint with the district court's assignment of all the parties' debts, including loans secured by some of the property, to him while awarding those same properties to Kelli. He contends that it is common practice in several of Kansas' judicial districts to order the party receiving an asset to also assume a debt that is secured by that asset and directs us to 2 Elrod, Kansas Law and Practice:  Kansas Family Law—Kansas Family Law, Ch. 10, Appendix 10B, § 3.05(B) (2021). But he also

20

acknowledges that there is no Kansas case law that addresses the issue and that guidelines do not have the same force and effect of the law. *In re Marriage of Schwien*, 17 Kan. App. 2d 498, 505, 839 P.2d 541 (1992).

We state once again that the district court has broad discretion in dividing the parties' property. And once again, Kerry has the burden to prove an abuse of that discretion but failed to do so. The district court's decision might not be in lockstep with the guidelines to which some other Kansas counties adhere, but those guidelines are not mandates that are binding on the district court. We see no evidence that an error of law, an error of fact, or an arbitrary, capricious, or unreasonable decision occurred here. See *Biglow*, 308 Kan. at 893.

DID THE DISTRICT COURT ERR BY EXTENDING TEMPORARY MAINTENANCE WHILE SIMULTANEOUSLY RULING THAT PERMANENT MAINTENANCE WAS UNNECESSARY?

For his final issue on appeal, Kerry argues that the district court erred when it directed him to continue paying temporary maintenance until such time as clear title to the real estate awarded to Kelli was established, despite the fact it did not order permanent maintenance.

*Standard of Review*

Appellate courts generally review a district court's spousal maintenance award for abuse of discretion and should uphold the court's findings if they are supported by substantial competent evidence. *In re Marriage of Vandenberg*, 43 Kan. App. 2d at 706-07.

*Discussion*

Under K.S.A. 2020 Supp. 23-2902(a), a district court may order maintenance "in an amount the court finds to be fair, just and equitable under all of the circumstances." Such maintenance may be ordered to be made in periodic payments. K.S.A. 2020 Supp. 23-2902(b). And the district court may make the future payments terminable under circumstances described in the decree of divorce. K.S.A. 2020 Supp. 23-2902(c). The district court entered a reasonable decision when it ordered Kerry to continue temporary maintenance until clear title passed to Kelli.

A large portion of the assets awarded to Kelli consisted of real estate which, if encumbered by mortgages and questions of title, would render liquidation difficult for daily living. Thus, the temporary maintenance appears designed to enable Kelli to have money for living expenses while simultaneously encouraging Kerry to quickly transfer the relevant property to Kelli. We cannot conclude that decision was unreasonable.

Kerry, citing *Beck v. Beck*, 208 Kan. 148, 149, 490 P.2d 628 (1971), argues that the temporary maintenance order impermissibly comingles the property division of the divorce with future support payments. In *Beck*, the trial court awarded the plaintiff $7,500 in alimony but then later reduced the amount to $5,000 after the plaintiff remarried. Under Kansas law at the time, however, remarriage generally marked the termination of alimony payments. But the trial court took the view that its order for alimony constituted a property settlement of sorts and refused to terminate the order.

On appeal, the Kansas Supreme Court held that the trial court demonstrated "an impermissible confusing and commingling of the concepts of property settlement and alimony." 208 Kan. at 149. It reiterated that when a decree of divorce is entered, payments to equalize the division of property should not be denominated as alimony. Rather, those two concepts must be kept separate. 208 Kan. at 149.

22

The situation here is different. There is no indication the district court confused future support with the division of property. Instead, the district court divided the property and also understood that Kelli would be unable to use that property in any meaningful way until the title was resolved. Thus, it ordered Kerry, who could use the property to generate income through his business, to pay temporary support to Kelli until the titles were property transferred. Again, there is every indication this decision was reasonable under the circumstances.

In sum, Kerry failed to carry his burden to establish that the district court abused its discretion through its division of the parties' assets, or by ordering that Kerry pay temporary maintenance until Kelli received clear title for the relevant properties.

Affirmed.